## COOKE v. COOKE et al.

No. 4357.   Decided June 19, 1926.   (248 P. 83.)

1. INFANTS—SHERIFF'S COMPLAINT, ALLEGING MOTHER'S IMPROPER CONDUCT, HELD SO WANTING IN FACTS, AND JUVENILE COURT'S PROCEEDINGS SO IRREGULAR, AS NOT TO AUTHORIZE CUSTODY OF CHILD BY PROBATION OFFICER.  Sheriff's complaint that 5 year old child was dependent and neglected delinquent because of mother's late hours with certain married man in automobile on public highway and other immoral and improper conduct, *held* so wanting in facts, and proceedings by which juvenile court ordered child into custody of probation officers so irregular, as not to confer jurisdiction on such court, or authorize arrest of child by probation officer.

2. HABEAS CORPUS.  Findings of referee, appointed to make them in original proceeding in habeas corpus, involving custody of minor child, *held* advisory only.

3. HABEAS CORPUS. Supreme Court will not disturb findings of referee, appointed to make them in original proceeding in habeas corpus, involving custody of minor child, where evidence was in direct conflict.

4. EVIDENCE. Transcript of evidence and oral opinion of Canadian court, certified to only by official stenographer, not filed with registrar or otherwise made of record, and without seal of court being annexed, *held* inadmissible; Comp. Laws 1917, §§ 7089 and 7090, being inapplicable.

Corpus Juris-Cyc. References.

[1]　Infants 31 C. J. p. 1107 n. 69.
[2]　Habeas Corpus 29 C. J. p. 173 n. 13.
[3]　Habeas Corpus 29 C. J. p. 195 n. 71.
[4]　Evidence 22 C. J. p. 855 n. 48.
[5]　Divorce 19 C. J. p. 363 n. 58.
[6]　Divorce 19 C. J. p. 366 n. 18.
[7]　Parent and Child 29 Cyc. p. 1599 n. 12.
[8]　Divorce 19 C. J. p. 366 n. 17.
[9]　Judgments 34 C. J. p. 1165 n. 29.
[10]　Evidence 22 C. J. p. 855 n. 48.
[11]　Evidence 22 C. J. p. 129 n. 91.
[12]　Judgments 33 C. J. p. 1139 n. 52.
[13]　Judgments 33 C. J. p. 1144 n. 82.
[14]　Courts 15 C. J. p. 979 n. 62.
[15]　Judgments 34 C. J. p. 1133 n. 12.
[16]　Judgments 33 C. J. p. 1076 n. 71; 34 C. J. p. 528 n. 14.
[17]　Judgments 34 C. J. p. 549 n. 33.
[18]　Process 32 Cyc. p. 492 n. 45.
[19]　Judgments 34 C. J. p. 1146 n. 93.
[20]　Divorce 19 C. J. p. 102 n. 6.
[21]　Appearances 4 C. J. p. 1318 n. 35.
[22]　Appearances 4 C. J. p. 1337 n. 64.
[23]　Appearances 4 C. J. p. 1339 n. 85.
[24]　Divorce 19 C. J. p. 175 n. 66.
[25]　Divorce 19 C. J. p. 152 n. 87.
[26]　Divorce 19 C. J. p. 175 n. 66.
[27]　Divorce 19 C. J. p. 349 n. 13.
[28]　Divorce 19 C. J. p. 345 n. 38.
[29]　Parent and Child 29 Cyc. p. 1598 n. 11.
[30]　Parent and Child 29 Cyc. p. 1598 n. 11.
[31]　Divorce 19 C. J. p. 344 n. 29.
[32]　Divorce 19 C. J. p. 355 n. 14.

Original Proceedings in Habeas Corpus

5. DIVORCE. In determining whether wife seeking custody of child was found guilty of adultery, in her action for alimony in Canada, court is concerned only with what was actually decided as appears from judgment roll, pleadings, and judgment as entered.

6. DIVORCE—FINDING OF CANADIAN COURT, IN WIFE'S ACTION FOR ALIMONY, THAT SHE WAS GUILTY OF ADULTERY, HELD NOT TO PREVENT HER FROM RETAINING CUSTODY OF CHILD. Finding of Canadian court, in wife's action for alimony, that she was guilty of adultery, *held* not to prevent her from retaining custody of child, in habeas corpus proceeding for such custody, though full faith and credit be given to Canadian judgment, and though adulterous wife cannot have custody of child there, since alimony action did not involve custody.

7. PARENT AND CHILD. General rule is that adultery will not necessarily deprive spouse of care and custody of children.

8. DIVORCE—INTERLOCUTORY ORDER OF CANADIAN COURT, GRANTING CUSTODY OF CHILD TO HUSBAND, HELD NOT TO PREVENT AWARDING OF CHILD TO WIFE. Interlocutory order of Canadian court, granting custody of child to husband, *held* not to prevent awarding of child to wife, in habeas corpus proceeding for such custody, since our courts need not give such order any greater effect than Canadian court could give it and can therefore rescind or modify it without discrediting it.

9. JUDGMENT. Courts are not required to give greater effect to order or judgment of foreign country than they give to that of sister state.

10. EVIDENCE. Transcript of evidence and opinion of court of sister state which granted custody of child to father, certified to only by official stenographer and not filed or made part of record, cannot be considered, in habeas corpus proceeding for custody of such child.

11. EVIDENCE. It will be assumed that court of sister state made order on and within issue presented by petition, in case before it, and did not go beyond it.

12. JUDGMENT. What is not juridically presented cannot be juridically decided.

13. JUDGMENT. Judgment or decree beyond pleadings is nullity.

14. COURTS. Court is bound by its record.

15. JUDGMENT. Order of court of sister state *held* not to have greater effect than interlocutory order of Canadian court, on which it was based.

16. JUDGMENT. Want of jurisdictional matters or .fatal infirmity appearing on face of judgment roll may be noticed either on direct or collateral attack.

17. JUDGMENT. Court cannot consider evidence to ascertain whether order or judgment was supported thereby, except as reviewing court.

18. PROCESS. One, coming into state solely to attend hearing before federal authorities, and who was detained by them, *held* immune from service out of state courts.

19. JUDGMENT—FAILURE OF COURT OF SISTER STATE TO CONSIDER PLEA OF IMMUNITY FROM SERVICE BY ONE COMING INTO SUCH STATE SOLELY TO ATTEND HEARING BEFORE FEDERAL AUTHORITIES, OR TO FIND WAIVER OF SUCH IMMUNITY, HELD SUCH FATAL INFIRMITY AS MAY BE NOTICED ON DIRECT OR COLLATERAL ATTACK ON JUDGMENT. Failure of court of sister state to consider plea of immunity from service by one who came into such state solely to attend hearing before federal authorities and was detained by them, or to find waiver of such immunity, *held* such fatal infirmity as may be noticed on direct or collateral attack on judgment.

20. DIVORCE—IN DIVORCE SUIT, AFTER FILING OF PROPER AND VERIFIED COMPLAINT AGAINST NON-RESIDENT DEFENDANT, ORDER FOR PUBLICATION OF SUMMONS BASED ON PROPER AFFIDAVIT, AND MAILING TO OR PERSONALLY SERVING DEFENDANT WITH SUMMONS AND COMPLAINT, COURT HELD TO HAVE JURISDICTION TO RENDER DEFAULT JUDGMENT. In divorce suit, after filing of proper and verified complaint against nonresident defendant, order for publication of summons based on proper affidavit, and mailing to or personally serving defendant with summons and complaint, court *held* to have jurisdiction to render default judgment granting divorce and awarding custody of child to parties within its jurisdiction, whether defendant had made special or general appearance, or none at all.

21. APPEARACE. Appearance to quash issuance or service of summons is special, regardless of whether it is so denominated.

22. APPEARANCE. Appearance for filing general demurrer to complaint, or otherwise pleading to merits, is general, regardless of whether it is so denominated.

23. APPEARANCE. Application for extension of time to plead constitutes general appearance.

24. DIVORCE. Plaintiff's averment, in deportation proceedings before federal authorities, that she was resident of Canada, *held* insufficient of itself to overthrow finding of state court, in divorce suit, as to defendant's residence.

25. DIVORCE. Question of plaintiff's residence, in divorce suit, *held* one of fact for determination by court on all evidence.

26. DIVORCE. In absence of allegations and proof of fraud of plaintiff, in prosecuting divorce action, finding of court therein as to her place of residence is conclusive on collateral attack.

27. DIVORCE. Divorce judgment, except as assailed for fraud or want of jurisdiction, held binding on defendant, not only as to dissolution of marriage, but as to custody of child, except as to subsequent changed conditions affecting its interest and welfare.

28. DIVORCE—DIVORCED MOTHER, WITH NO INCOME OF HER OWN, HELD ENTITLED TO CUSTODY OF 5 YEAR OLD CHILD, WHICH HAD BEEN IN HER CUSTODY SINCE BIRTH, AS AGAINST FATHER, WHO WAS CANADIAN BARRISTER AND SOLICITOR, WITH NET INCOME OF $7,000 ANNUALLY. Divorced mother, with no income of her own, *held* entitled to custody of 5 year old child, which had been in her custody since birth, as against father, who was Canadian barrister and solicitor, with net income of $7,000 annually, where mother's stepfather and her mother were willing to provide comfortable home for her and child.

29. HABEAS CORPUS. In absence of charge or allegation as to unfitness of mother, in habeas corpus proceeding for custody of child, her indiscreet relations with men *held* irrelevant to the issue.

30. PARENT AND CHILD. Unfitness, which deprives parent of right of custody of child, must be positive and not merely comparative, or speculative.

31. DIVORCE. Fact that divorced wife has no separate income is no legal reason to deny her custody of minor child.

32. DIVORCE. Divorced father has legal duty within his means to contribute to support of minor child, though wife is awarded custody of it.

Gideon, C. J., and Cherry, J., dissenting.

Original proceeding in habeas corpus, involving the custody of a minor child, by James Henry Cooke against Hilda Betty Cooke and another, brought during pendency of the

named defendant's appeal from the judgment of the district court discharging a writ of habeas corpus brought by her after the juvenile court had ordered the child into the custody of the probation officers. Custody of child awarded to the named defendant on condition.

*Gustin & Pence*, of Salt Lake City, and *Joseph A. McCaffrey*, of San Francisco, Cal., for plaintiff.

*King & Schulder*, of Salt Lake City, for defendant Hilda Betty Cooke.

STRAUP, J.

This is a proceeding in habeas corpus involving the custody of a minor child, a girl about 5 years of age. The plaintiff, James Henry Cooke, in his complaint or petition, alleges that he is the father of the child; that he is a resident of the city of Toronto, province of Ontario, Dominion of Canada, where also the child and its mother, defendant herein, Hilda Betty Cooke, resided until, as it is alleged, she, surreptitiously and without the consent of the plaintiff, removed the child from Canada to the States; that the laws of Canada give him the paramount right to the custody and control of the child, and that, in addition thereto, in a proceeding had in a Canadian court between the parties herein, the defendant, on the 14th day of January, 1925, was adjudged guilty of adultery, which adjudication it is alleged under the laws of Canada forever barred her from all right to the care, custody, and control of the child; that thereafter, on the 26th day of January, 1925, plaintiff, in another proceeding in Canada, a habeas corpus proceeding, wherein he was plaintiff and the defendant the defendant, he obtained another judgment awarding to him the custody and control of the child that thereafter, in another habeas corpus proceeding brought by him in the superior court of California at San Francisco wherein he was plaintiff and the defendant the defendant, he on the 29th day of Septem-

ber, 1925, obtained another judgment wherein he was again awarded the custody and control of the child. Then it is alleged that the defendant, surreptitiously and without the consent of the plaintiff, brought the child to the state of Utah, where, in Salt Lake county in certain proceedings had, the defendant was "charged with juvenile delinquency and the custody of the child taken from her and placed in the custody of David Guest, the probation officer of the juvenile court, and that the defendant Hilda Betty Cooke, on the ground that the juvenile court had no jurisdiction of the matters alleged before it and that the juvenile court and its officers unlawfully detained and restrained the child from her custody, instituted habeas corpus proceedings against the juvenile court and its officers in the district court of Salt Lake county, and that upon such hearing it was adjudged that the juvenile court had jurisdiction and upon that ground denied the writ applied for, from which judgment the defendant Hilda Betty Cooke prosecuted an appeal to this court. Except as alleged that the defendant, by the Canadian court, was adjudged guilty of adultery, it is not alleged by plaintiff that she is an unfit or unsuitable, or otherwise an immoral, incompetent, or improper, person to have the care, custody, or control of the child.

The defendant, by her verified answer, denied that she was found or adjudged guilty of adultery by the Canadian court, and denied that she, in Canada or elsewhere, at any time committed adultery with any one. She denied that by any valid judgment or decree in Canada or in California she was ordered or adjudged to surrender or deliver the care or custody or control of the child to the plaintiff, or that she surreptitiously removed it from Canada to the States, or to Utah, and averred that when the alleged order or decree in Canada was rendered on the 26th day of January, 1925, she and the child were domiciled and residing in the state of Nevada, and denied all other material allegations of the complaint. She further alleged that she and the plaintiff were married in Canada in December, 1919, she then being of the

age of 19 years and he 39 years; that he drank intoxicating liquors to excess and at times remained in an intoxicated condition for several days at a time and when in such condition he was quarrelsome, abusive, used profane language, and at times compelled her to accompany him in public places causing her much humiliation and mental distress; that about three months after the marriage she became pregnant when the plaintiff began to abuse her and treat her with extreme cruelty and greatly neglected her, and when she became seriously ill and was by her mother removed to a hospital and later to her mother's home, covering a period of about six weeks, the plaintiff neglected and refused to see or visit the defendant and failed to inquire of her condition or welfare; that after she partially recovered she returned to her own home, but the plaintiff continued to neglect and illtreat her, and when ill and well along in pregnancy he neglected and refused to employ or give her any help and left her alone; that when she gave birth to the child she was taken to a hospital, but that the plaintiff did not visit her until 3 days after the birth of the child, and then flew in a rage and quarreled with and greatly disturbed her, and did not again visit the defendant or make any inquiry concerning her until about 11 days thereafter, and when about two weeks after her confinement she was ready to leave the hospital and go to her home the plaintiff refused to assist her in any way and compelled her to send for a taxicab to take her home; that after she returned to her home the plaintiff continued to illtreat and abuse her, and when the child was one year old the plaintiff, in an angry and violent manner, and without cause, grabbed the defendant and tore clothing from her body and injured and wounded her arm, and on another occasion grabbed her by the throat and severely choked her; that the plaintiff was a sexual pervert and constantly insisted on excessive indulgences, and on several occasions when a young girl 17 years of age, and a relative of the defendant, was a guest at her home, the plaintiff, in the nighttime, entered the girl's chamber and attempted to have sex-

ual intercourse with her; that he without cause, become intensely jealous of the defendant and wrongfully accused her of associating with other men; that he employed numberous and divers detectives to watch and observe all of her movements, when she left the house, when she returned, where she went, and as to what she did; that in 1921 the plaintiff induced the defendant to go to a theater with her aunt, he stating that he was ill and for that reason was unable to accompany them, and while the defendant was absent at the theater he removed the child from their home and upon the defendant's return he caused a detective in his employ to serve her with papers in a divorce proceeding pretended to be instituted by the plaintiff against her and kept the child concealed from her for a period of four weeks or more and then consented to restore the child to her providing she gave him the sole occupancy of their home; that the defendant consented to do so, whereupon the child was restored to her, and, at the plaintiff's instance that she do so, she went to Buffalo, N. Y., he agreeing to pay her $35 a week for her support and that of the child; that, in pursuance of such agreement, she went to Buffalo with the child, staying there for a period of three months; that the plaintiff during such period, at week ends, went to Buffalo and there registered at a hotel, but, instead of staying there, he clandestinely stayed and cohabitated with her at her apartments; that the defendant declined to longer live with the plaintiff under such conditions and demanded that he live openly with her as his wife, and thereupon, at his instance, she and the plaintiff entered into a written agreement whereby he agreed to give her the sole custody of the child and to dismiss the divorce proceedings, in consideration of which she released and transferred all her right, title, and interest in and to all property owned or possessed by her, and thereupon they returned to Toronto, where the plaintiff procured apartments for her, and where they continued to live together for some time as husband and wife, that the plaintiff dismissed such divorce proceedings, but in 1923, to hu-

miliate and degrade her, he commenced another divorce pro-
ceeding against the defendant before the Canadian Parlia-
ment, charging her with having committed adultery with
16 different men, many of whom were strangers to her and
whom she had never seen or met and did not even know of
them; that the defendant answered such charges and denied
all of them; that at the hearing before Parliament the plain-
tiff withdrew all but three of such charges, but even as to
those the House committee unanimously decided in favor
of the defendant and against the plaintiff and dismissed
the proceedings; that in the month of January, 1925, the
defendant, with her mother and with the child, departed
from the Dominion of Canada and went to the state of Ne-
vada, where they established a residence, and that while so
residing in Nevada the plaintiff, on the 26th day of January,
1925, without service or process on the defendant, caused
to have entered the alleged judgment referred to in plain-
tiff's complaint, ordering the custody of the child to plain-
tiff, but that such judgment was invalid and of no legal
force or effect; that while the defendant, with her mother
and the child, were residing in Nevada the plaintiff unlaw-
fully caused the federal authorities at San Francisco to issue
a warrant for the arrest and deportation of the defendant
and the child and caused federal officers to arrest and im-
prison the defendant, and that to obtain her release from
imprisonment she was required to give bond for her appear-
ance before the federal authorities at San Francisco, and
that, when in obedience thereto, and not otherwise, she ap-
peared in San Francisco, the plaintiff caused a writ of
habeas corpus to issue out of the state superior court at
San Francisco for the custody of the child, upon the ground
that the defendant was unlawfully detaining its custody
from him; but, inasmuch as the defendant was involuntarily
and by process from federal authorities and not otherwise,
brought into the jurisdiction of the superior court, the de-
fendant alleged that such court had not acquired jurisdic-
tion of her person, and hence any judgment rendered by such

court was of no force or effect; and that the deportation proceedings instituted by the plaintiff were dismissed at Washington, D. C.

And the defendant further alleged that she became an actual resident of the county of Washoe in the state of Nevada on the 20th day of January, 1925, and continuously resided therein until the 22d day of October, 1925, a period of about nine months, when she filed her verified complaint against the plaintiff in the district court of the state of Nevada in and for the county of Washoe, in which she prayed that the bonds of matrimony between herself and the plaintiff be dissolved and that the care, custody, and control of the child be awarded to her; that, by her affidavit duly and regularly filed in the cause for publication of summons, an order for publication was duly had on the 22d day of October, 1925, and that summons was duly and regularly issued out of the court in such action and was personally served on the defendant therein, the plaintiff herein, at the city of Toronto, province of Ontario, Dominion of Canada, on the 10th day of November, 1925, and, within the time in which the defendant therein was required to appear and answer the complaint of the plaintiff therein, he entered his appearance in the case and filed a notice of motion and a motion in the action, which motion came on regularly to be heard on the 29th day of December, 1925, and was by the court denied, and, upon the failure of the defendant therein to further plead or answer the complaint, his default was entered, and thereafter the case was set for trial on the 31st day of December, 1925, at which time the court heard the testimony presented in the cause and rendered and entered findings of fact, conclusions of law, and a judgment or decree, in which the facts were found as alleged in the complaint finding that the defendant therein was guilty of extreme cruelty and as in such complaint alleged, and granted the plaintiff therein a divorce as prayed and, among other things, found and decreed that the plaintiff therein was, but that the defendant therein was not, a fit and proper

person to have the care, custody, and control of the child, and ordered, adjudged, and decreed that the plaintiff therein be and she was granted the care, custody, and control of the child; which findings, judgment, and decree were rendered and entered on the 31st day of December, 1925.

The defendant herein, further alleging, admitted that a complaint was issued against her in the juvenile court of Salt Lake county, but alleged that the complaint as filed stated no cause of action, and that the juvenile court, unlawfully and without right or authority, ordered the child into the custody of the probation officer, David Guest, and that the amended complaint which was thereafter filed (after these proceedings were commenced) was filed at the instance and request of counsel for plaintiff herein and to aid him in these proceedings, and she denied that the child, at any time, had been a dependent delinquent or in any particular neglected, and alleged that the child, at all times, was given constant and proper care and attention and was under the personal supervision of the defendant herein, or of her mother, the grandmother of the child.

Since the habeas corpus proceedings brought by the defendant against the probation officer and others are referred to in these proceedings and by consent of all concerned are to be considered in connection therewith, it is necessary to set forth the substance of such proceedings. In her petition for a writ of habeas corpus filed in the district court of Salt Lake county, state of Utah, the defendant herein, the plaintiff therein, alledged that while she was temporarily in Salt Lake City, Utah, she was unlawfully and wrongfully deprived of the custody and control of the child and the liberty of the child restrained, on a complaint having been filed in the juvenile court of Salt Lake county charging that the child was a dependent delinquent and was neglected; that no warrant was issued on the complaint and that the juvenile court only orally directed the probation officer to seize and arrest the child and to deliver it to the matron of the Girls' Detention Home; that, upon the arrest

of the child, the defendant herein, the plaintiff therein, demanded that the child be taken to the juvenile court and that bail be fixed for the appearance of the child, but the probation officer refused to do so, and that she then applied to the juvenile court and demanded that bail for the appearance of the child be allowed and fixed, but the juvenile court likewise declined to admit the child to bail; that no order or demand was issued for the child or any order directing the holding of the child; and that no hearing was had and no determination of any kind made that the child was in any manner neglected or was not properly cared for. Upon the filing of such petition the district court granted a writ requiring the production of the child in court. In obedience thereto the probation officer and the matron produced the child in court. The county attorney and Gustin & Pence, plaintiff's counsel, appeared for the probation officer and the matron. Pending the hearing the court ordered the child to be delivered into the custody of one of the counsel for plaintiff therein, the defendant herein. The only return filed by the probation officer and by the matron justifying the arrest and detention of the child by them was a verified complaint of Benjamin R. Harries, the sheriff of Salt Lake county, filed in the juvenile court, wherein he, on oath, stated "The facts or acts constituting the said juvenile a dependent and neglected delinquent as follows: That on or about the 24th day of November, A. D. 1925, at the county of Salt Lake, state of Utah, said Shirley Cooke, a child 5 years of age, did become dependent and neglected by reason of her mother at the time and place aforesaid having been out at late and unusual hours in company with Earl Welch, a married man, in an automobile on the public highway and otherwise conducting herself in an immoral and improper manner." No other or further showing was made justifying the arrest or detention of the child by the probation officer or the matron than the filing of such complaint. The plaintiff therein, the defendant herein, replying to such return, alleged that the complaint filed by the sheriff was wholly

insufficient to invoke judicial action, and stated no facts whatever to show that the child was a dependent or neglected delinquent or to justify the detention of the child, and stated no legal cause for the probation officer to detain the child, and denied that she was guilty of any improper conduct whatever, and alleged that while she was in Salt Lake City she or her mother had constantly been with the child and gave it all proper care and attention and that the child at no time had been neglected.

Upon the issues so presented the district court, without hearing any evidence, but on the pleadings, ordered and adjudged:

"That this court has no right, power, authority, or jurisdiction to hear or determine any question of fact or any question of law raised by the pleadings on file herein, and by reason thereof the said plaintiff and petitioner is not entitled to the relief demanded, and it is therefore ordered that the writ of habeas corpus heretofore issued be and the same is hereby discharged."

The court further ordered that pending an appeal the child remain in the custody of counsel for plaintiff or petitioner therein upon his giving a bond in the sum of $1,500. From the judgment discharging the writ the plaintiff there prosecuted an appeal to this court.

We may as well dispose of that now. While the record in such proceeding is presented to us for review, not much of anything is said about it. The writ asked for by the plaintiff herein runs against the probation officer, as well as against the defendant Hilda Betty Cooke. But the probation officer makes no defense as against the plaintiff and does not resist his application for the custody of the child; nor by argument or brief has the probation officer presented any defense against the defendant's custody of the child. The question as to the right of the probation officer to hold and detain the child has become entirely subordinated to the more important and paramount question of the custody of the child as between the plaintiff and the defendant herein and upon the issue presented by them.

Still the record of such other proceeding is here and put up to us for review. Without further elaborating upon it, and that we may be brought to the real controversy between the plaintiff and defendant, let it suffice by saying that we are of the opinion that the complaint filed before the juvenile court was so wanting in facts and that the proceedings therein were so irregular as not to confer jurisdiction upon that court or as to authorize the arrest or detention of the child by the probation officer and that the arrest and detention were without process and unauthorized. We therefore think the district court erred in discharging the writ and that the cause in such respect ought to be remanded with directions to the district court to grant the writ as in such particular prayed, except as the custody of the child may otherwise be disposed of from further considerations of these proceedings.

Recurring now to the real controversy. The case on the issues presented between the plaintiff and the defendant was referred to one of the district judges of Salt Lake county to take the evidence and make findings and report them to this court. In accordance therewith the district court heard all the evidence, which is voluminous, consisting of oral and documentary evidence, made findings and reported them, together with all of the evidence received and all that was offered and excluded, to this court.

Some of the finds are in favor of the plaintiff and some in favor of the defendant. Those in favor of the plaintiff are complained of by the defendant and those in favor of the defendant are complained of by the plaintiff. The referee, among other things, found that the plaintiff was of good moral character and social and financial standing and that he was a fit and proper person to have the custody of the child. The referee also found:

That the defendant was a fit and proper person to have the care, custody, and control of the child; that she was a young woman of intelligence and refinement, and that she and the child were devotedly attached, and that she has had the custody and care of the child

since its birth and had at all times well cared for her; that the child was comfortably dressed and from appearances well treated and was intelligent, well behaved, keen, and healthy; that, while "I have been compelled to find Mrs. Cooke guilty of the misconduct determined by the Ontario judgment, there was in that case no evidence of the direct fact and there is no evidence that she has been guilty of any wrong-doing since that time, or that she has any immoral habits; she has been harrassed for many months, and an individual named in the record has taken advantage of her condition and forced his attentions upon her. But there is no evidence of even a suspicion of improper relations between them."

The referee further found that the defendant's mother, now Mrs. Frank B. Scott (she and Scott, a practicing attorney for many years at Salt Lake City, having intermarried since the commencement of these proceedings), was deeply attached to the child, and that she and her husband are willing and able to provide a home for the defendant and the child and to provide for, educate, and rear it, and that the taking of the child from the defendant would endanger the child's happiness and welfare, as the child was a comparative stranger to the plaintiff and his sister, and that under the evidence there was no question that the defendant, with the assistance of her mother, could make provision for the ordinary comfort, contentment, and the intellectual and moral development of the child. The referee further found:

That, notwithstanding the plaintiff's "excellent qualities and his high social and professional standing," he was at the start of his married life "uncongenial and erratic, and always evinced an implacable dislike for the defendant's mother, who, I might add, is a woman of good character and reputation. During the first year of the marriage the plaintiff seemed to have a mania for separation agreements, which was not at all attributable to his wife's indiscretions, and in this and other ways kept Mrs. Cooke in continuous suspense and uncertainty and in anticipation of the danger that the child may be taken from her; that, in view of the way Mrs. Cooke's name has been linked both in the proceedings and in the public press with an individual who is unworthy of her, I recommend that, if the child be awarded to Mrs. Cooke, it be for a probationary period and that she be required to give security that she will not remove the child from the jurisdiction of this court."

The referee was only to make findings and not to state any conclusions or to render any judgment. The findings, of course, are only advisory and in no sense binding on us. Both parties also complain of rulings admitting and excluding evidence; the plaintiff as to some, and the defendant as to other portions. These, as well as the findings, will be noted as we proceed. With respect to the issues, both parties, at some length, and other witnesses, testified before the referee. Depositions were taken by both of witnesses in Canada and by the defendant of witnesses in Nevada. Considerable documentary evidence was introduced and considerable offered which was excluded by the referee, but such as was excluded was identified and made of record for our consideration if by us deemed competent and material.

Perhaps the matter may best be understood by proceeding with it chronologically. We, of course, cannot herein and shall not attempt to refer to all the evidence in detail. We, however, shall refer to the substance of what may be regarded as the most important and to illustrate the divers positions taken by both parties. At the threshold of the case, when the issues were being made, the plaintiff moved to strike from the defendant's answer all of her allegations respecting the alleged cruel treatment by the plaintiff, his alleged misbehavior and misconduct, his alleged excessive indulgence in intoxicating liquors, the divorce proceedings had in Nevada, and in effect about all of the affirmative allegations contained in her answer. This on the theory that under the law of Canada the plaintiff had the paramount right to the custody of the child and that the pleaded judgments in his complaint, which, as asserted by him, awarded the custody of the child to him and forever barred the defendant from its custody or access. On a hearing before us the motion was denied and the case on the issues as presented by the complaint and answer referred.

It appears from the record that the plaintiff was and is

a barrister and solicitor practicing his profession at Toronto. His net income, as testified to by him, was about $7,000 annually. He was the owner of a residence in Toronto and of a summer home, both of the value of about $30,000 and both well furnished; the value of the furniture being between $5,000 and $10,000. He also was the owner of other personal property. He and the defendant were married to each other at Toronto in December, 1918. She was then 19, and he, as she testified, 39, and as he testified, 35 or 36 years of age. They were both reared in the province of Ontario. After their marriage the parties spent their "honeymoon" in New York, where they remained about two weeks. She testified that during such period the plaintiff was frequently intoxicated. He, while admitting that during such period he drank liquor in his room and at a club with one of his friends, and at dinners, etc., denied that he was intoxicated or drank liquor to excess. On that subject the defendant and other witnesses testified that during their marriage the plaintiff, from a stock of liquor kept at his house, drank excessively and frequently became intoxicated. The plaintiff admitted that he kept a stock of liquor at his house and that he at times drank liquor and served it to his guests, but denied that he drank it excessivlely or to the extent of becoming intoxicated. Upon that subject the plaintiff took the depositions of a number of witnesses in Canada, friends of the plaintiff and associates of his, who deposed that, while the plaintiff drank liquor occasionally and sometimes enough to "feel good," he did not drink liquor excessively or to the extent of becoming intoxicated. Most of such witnesses, however, had no knowledge as to the extent of liquor drank by the plaintiff at his residence. However, the referee found such issue in favor of the plaintiff. Though there is a direct conflict in the evidence as to such issue, we, nevertheless, are inclined to adopt the finding of the referee in such particular.

When the parties were in New York on their "honeymoon" trip the defendant purchased an $18 hat and some wearing

apparel amounting to $36. She testified that he flew in a rage and that they quarreled over it. The plaintiff admitted that he and his wife had a fuss about it, and that he had her note on a piece of paper the amount of money spent by them on the trip, and that he thereafter put opposite the figures what the items were for, and that he kept the memorandum and produced it at the trial. When the parties returned from New York the defendant's mother, knowing of the time of their arrival, prepared breakfast at her home and met them at the depot at Toronto and invited them to her house for breakfast. The plaintiff, without any cause or excuse, took offense at the invitation and with no explanation to his wife or to her mother, in a rather petulant manner, left them unattended at the depot and went to his office. According to all of the evidence the mother is a woman of refinement, of good morals and reputation. Her husband, Mr. Bowman, who was then alive and with whom she was then living, was a contractor and builder in Toronto. The plaintiff does not claim that he, prior thereto, had any trouble with Mrs. Bowman, the defendant's mother or that there was any ill feeling existing between them, or with any member of her family. The plaintiff, before he and his wife went to New York, rented a house and furnished it at Toronto, in which they intended to live on their return. Neither of them had lived in the house before, nor was it occupied by any one while they were in New York. The only reason the plaintiff gave for refusing Mrs. Bowman's invitation was that he thought the defendant would be anxious to get to her own home, but he admitted that there was no one there to prepare breakfast for them. However, as found by the referee, the plaintiff from the start manifested a pronounced dislike for the defendant's mother and a displeasure of her visiting with the defendant, and himself testified that he did not want her to come to his house while he was there. The plaintiff and defendant started to live together at the apartment provided by him. She testified, and she is corroborated by other witnesses, that almost from

the start plaintiff was irritable, erratic, and illtreated her. Within about three months after the marriage the defendant became pregnant. She testified that she desired children and that plaintiff did not. He denied that; but, notwithstanding such denial, he, on the 4th day of April, 1919, just about four months after the marriage and while the parties were living together as husband and wife, prepared a separation agreement, which at his instance was signed by both parties and in which agreement it was recited that—

"The parties hereto will henceforth after April 5, 1919, live separate from each other and neither of them will take proceedings against the other for restitution of conjugal rights or molest or annoy or interfere with the other in any manner whatever. (2) The party of the first part, on condition that as long as the part of the second part shall lead a chaste and virtuous life, will pay to the party of the second part the sum of $100 a month, payable $50 half-monthly, and the said payments to commence and the first payment to be made on the 1st day of April, 1919; said payments to terminate on breach of said condition. (3) The party of the second part agrees to pay her own debts and to keep the party of the first part indemnified therefrom and if the party of the second part shall make default in observing these covenants all moneys paid or to be paid by the party of the first part in respect to any such debt or liability shall be refunded to him out of the moneys payable hereunder. (4) The party of the second part agrees not at any time hereafter to commence or prosecute any proceedings or other action to compel the party of the first part to live with her or to allow her any support or maintenance, other than the amount hereby agreed to be paid to her or otherwise howsoever. (5) The party of the second part agrees that she will not live or reside during the continuance of this agreement in any place other than the city of Toronto or the city of Hamilton in the province of Ontario, except visits to other parts of the province of Ontario, and that breach of this condition shall relieve the party of the first part from payment of any moneys hereunder. (6) It is agreed that, if the parties hereto shall at any time hereafter agree to cohabit as man and wife, then the said payments shall cease to be payable and this indenture shall become void."

The plaintiff gave no reason for entering into such agreement or arrangement. It is not claimed by him that his wife, up to that time, had done anything out of the way, or

that she had been unfaithful or even indiscreet, or in any particular had been unmindful of any of her marital obligations.  Along about May 1st the defendant took sick with pernicious vomiting and because of such condition, so the plaintiff testified, he returned to her, when they resumed their marital relations.  But the defendant testified that the plaintiff continued to illtreat and neglect her, many times leaving her alone when she was ill, gave her no help, and that finally she became so ill that she had to be removed to a hospital.  She remained there about 10 days or more. There is a dispute at to whether the plaintiff paid the hospital expenses and for the defendant's medical attention. She testified that her parents paid all of such expenses.  He testified that he employed his own physicians and paid them, as well as the hospital expenses.  Upon the advice of the family physician the defendant was taken from the hospital and to the residence of her sister and later to the residence of her mother, where the defendant could better be under the constant care of the family physician.  The plaintiff testified that he objected to the defendant then leaving the hospital and going to the residence of either her sister or her mother.  Defendant and her mother testified that while the defendant was at the hospital the plaintiff visited her but once and that he refused to visit her while she was at her sister's or her mother's residence.  The plaintiff again denied that he had illtreated the defendant, and testified that when she was at the hospital he called there to see her at different times, but admitted that he did not visit her while she was at her sister's or at her mother's residence covering a period of more than a month.  But again, notwithstanding his denials, he, on the 21st day of June, 1919, prepared another separation agreement and presented it to the defendant, which, at his instance, was signed by both parties, wherein was recited about the same matters that were recited in the prior agreement, except that the plaintiff agreed to pay her $75 instead of $100 a month, and the defendant agreed "to accept the said money in full settle-

ment of all and every claim which she may now or may at any time hereafter have against the said party of the first part and agrees to pay all her own debts and to keep the party of the first part indemnified therefrom."

Again no reason was given by the plaintiff for entering into such second agreement or arrangement. Again no claim was then or is now made that his wife, up to that time, had been unmindful of any of her marital obligations, or in any respect had not been to him a dutiful wife. On the witness stand he was asked what he meant by inserting into the agreements the provision that "as long as the party of the second part shall lead a chaste and virtuous life," and but answered that such was only "a usual clause in separation agreements, the usual form that is used in separation agreements, a stereotyped form." The defendant and her mother testified that such last agreement was made while the defendant was still at the hospital. He testified it was made about two weeks after she left the hospital. Some time after that the plaintiff and defendant again resumed their marital relations and lived together at his residence, but, as she testified, his illtreatment continued; that she was ill most of the time during the period of pregnancy and until the birth of the child; and that plaintiff neglected to procure any help or service for her and objected to her mother visiting the defendant. The plaintiff denied such illtreatment, but admitted that he objected to the mother visiting the defendant. When asked whether he did not think that his wife, a girl so young and for the first time in a delicate condition, was not under such circumstances entitled to the confidence and advice of her mother, he but answered: "That is a matter of opinion." Even from his own testimony it does not appear that he, from the time his wife became pregnant until the birth of the child, gave her any consideration or help, or manifested any love or affection for her, or regarded or treated her with the care and attention that a wife in such condition and circumstances deserves. Mrs. Bowman, the mother, testified that, realizing the plain-

Original Proceedings in Habeas Corpus

tiff's dislike for her, she, for such reason, as much as possible, avoided visiting her daughter and did so only as she felt the necessity of the occasions required.

The defendant was confined at the hospital. The child was born in December, 1919. The defendant and her mother testified that during the period the defendant was at the hospital the plaintiff called but once, about 3 or 4 days after the birth of the child, and that he then quarreled with the defendant because of the presence of her mother and so disturbed the defendant that he was ordered out of the room by the attending nurses. The plaintiff testified:

That "3 or 4 days after she was in the hospital I went up to call on her about 7 or 8 at night. The visiting hours at the hospital, you may say, concluded at 9 o'clock in the evening, and I found Mrs. Bowman sitting in the room. The next evening I went up Mrs. Bowman was there again and I spoke to Mrs. Cooke afterwards that night, and asked her if she would kindly request her mother not to be in the room at night because my visit was very short, only about an hour. I asked if she would please request her mother not to be there the next night. When I got there she was there just the same. Then I told Mrs. Bowman I did not want her in the room while I was there. There was some discussion at that time and I think Mrs. Bowman left a few minutes afterwards."

He further testified that "she persisted in coming back," and that it was a great cause of friction at the hospital, because, as he testified, Mrs. Bowman had the whole day to spend with Mrs. Cooke and that he had only an hour or two in the evening, and that he called there about every evening. About two weeks after the birth of the child, the defendant returned to her home, and, notwithstanding the last agreement of separation, the parties there again resumed their marital relations and lived together. The plaintiff then employed help for the defendant, but, as appears by the undisputed testimony, their living together was not pleasant; only tolerable. Among other things the defendant accused the plaintiff of intimacy with the maid. The plaintiff denied that. Later the maid left. The defendant also accused the plaintiff of entering, in the nighttime, the bedroom occupied

by her younger sister, and on another occasion, in the nighttime, of entering the bedroom of another female relative of the defendant, and that he attempted to have sexual intercourse with them. The plaintiff denied that. As to such matters, the referee found in favor of the plaintiff. Because the evidence respecting such circumstances is in direct conflict, we are not disposed to disturb the findings of the referee in such particulars.

The parties continued living together until in December, 1922. At that time, the defendant being without a maid, her aunt was stopping with her. The plaintiff procured two theater tickets. On that evening he pretended he was ill and for such reason could not accompany the defendant to the theater, and requested that the defendant and her aunt use the tickets, and volunteered to take care of the child while they were gone. The defendant and her aunt took the tickets and went to the theater. Upon their return they found the plaintiff at the house, but the child missing, and as soon as the defendant entered the house the plaintiff, who theretofore had prepared papers for a divorce on the ground of adultery to be filed before the Canadian Parliament, caused a detective of the Thiel Detective Agency and in the employ of plaintiff to serve the defendant with such papers. He had not theretofore accused the defendant with any such wrongs or acts, nor had he otherwise made any complaint to her of any improper associations with any one. He refused to tell the defendant what became of the child or where it was. Under the laws of Canada—so we are informed by counsel for both parties—the only tribunal authorized to grant a divorce a vinculo matrimonii is the Canadian Parliament and then only upon the ground of adultery, and that the courts of Canada are authorized only to grant allowances for what is similar under our laws for separate maintenance. And under the laws of Canada it is further provided:

That "no order directing that the mother shall have the custody or access to an infant shall be made in favor of the mother against

Original Proceedings in Habeas Corpus

whom an adultery has been established by judgment in an action for criminal conversation or for alimony."

At that time the plaintiff had purchased and owned the dwelling where the parties lived and owned the other property hereinbefore mentioned. The service of the papers upon the defendant of course created a great disturbance. Notwithstanding the pleadings of the defendant for the child, the plaintiff refused to disclose to her where the child was, or what he had done with it. She immediately employed counsel and began a search for the child. It was something like a month before she discovered its whereabouts. She had commenced proceedings against the plaintiff for the recovery of the child, but the plaintiff avoided service by going to Atlantic City, where he remained for several weeks. She, however, finally got service upon him. The child was found where the plaintiff had placed it with one of his lawyer friends who had employed the maid who theretofore had left the service of the defendant and with whom the plaintiff was accused with intimacy. Upon service on the plaintiff, he, on the 20th day of January, 1923, prepared another separation agreement, which at his instance was signed by both parties; the defendant testifying, which is not seriously denied by the plaintiff, that she was required to enter into such agreement in order to get possession of the child. The agreement recites:

"(1) Hilda Betty Cooke is to discontinue immediately all further proceedings in the application instituted in the Supreme Court of Ontario under the Infants' Act, for the custody of Shirley Betty Cooke, said proceedings to be stayed for a period of six months from the date hereof or until July 20, 1923. (2) The question of the custody and control of Shirley Betty Cooke is in the meantime to be disposed of under the following arrangement: Each of the parties hereto is to be entitled to the custody of said child for each alternative month during the said period; that is to say, said Hilda Betty Cooke shall have custody of the child for the first month or until February 20, 1923, James Henry Cooke for the second month, or from February 20th to March 20, 1923, and so on therefrom until the question of legal custody of said child is finally determined by a court of competent jurisdiction. Each party is to have the undisputed legal cus-

tody of said child during said period free from interference by either party or his or her agents, friends, or relatives, provided that, if either of the parties hereto should for any reason waive custody for any month, it shall not be deemed to alter the terms of this agreement in any way. The said Hilda Betty Cooke agrees that, during the period that she has the custody of said child, said child shall not be kept at the residence of or left in the care of Mrs. J. W. Bowman, her mother, and that breach of this condition shall be considered a breach of this agreement and shall entitle the party of the first part, at his option, to terminate same, when the rights of both parties shall be restored to the same position as immediately prior to the signing of this agreement. (3) Hilda Betty Cooke is to deliver forthwith to James Henry Cooke immediate, sole, undisputed, and exclusive possession of the premises 46 Gotham avenue (the premises owned by plaintiff and where the parties resided), free from any interference by the said Hilda Betty Cooke, her relations, friends, or agents, for the said period of six months. (4) The divorce proceedings commenced by James Henry Cooke are to stand over for six months from the date hereof and the divorce petition served by James Henry Cooke on Hilda Betty Cooke is not to be proceeded with until then after expiry of said six months."

The agreement further provides that entering into the agreement should not be construed as a condonement of any kind on the part of either party, or to preclude or prevent either party using evidence of misconduct in the divorce proceedings; that the plaintiff agreed to pay the defendant the sum of $30 a week, payable monthly, "which said sum of money Hilda Betty Cooke agrees to accept in full settlement of all claims either for maintenance or alimony from the said James Henry Cooke during the said period, and the said Hilda Betty Cooke agrees that she will not reside either at her mother's residence or with her mother during the said period that she received the maintenance allowance aforesaid," and that "after the expiration of said six months Hilda Betty Cooke shall be at liberty to proceed with her alimony action against her said husband for such amount as she may think advisable," and plaintiff agreed that he would not during a period of one year dispose of or remove the furniture from their residence, nor sell or dispose of the premises within such period.

Upon entering into such agreement the plaintiff surrendered and delivered the child back to the defendant and she turned the keys of the residence over to him. At his request she, with the child, temporarily went to Buffalo, N. Y.; he stating to her that he thought it was best for her to do so until the matter at Toronto "blew over." In accordance with such request she went with the child to Buffalo and remained there for about three months. During that period the plaintiff, at week ends, went to Buffalo and there lived and cohabited with the defendant at her apartments. During that period the plaintiff paid the expenses there for her support and maintenance. The defendant, however, complained to the plaintiff of living together under such conditions, that their friends knew of their separation, but did not know of his visits with her at Buffalo and there living and cohabiting with her, and insisted that, if the plaintiff was going to live with her, he do so openly. She testified that they then agreed that she should return to Toronto where they would again resume their marital relations and that, in pursuance thereof, she returned to Toronto with the child, where the plaintiff, who in the meantime had sold the home, procured other apartments for her where they then resumed their marital relations. He admitted that he at week ends visited the defendant at Buffalo and while there lived and cohabited with her, but denied that he lived and cohabited with her after she returned from Buffalo to Toronto, and testified that she returned to Toronto because of the death of her father, after which she did not go back to Buffalo. If the plaintiff at all lived and cohabited with the defendant after she returned from Buffalo it was only for a short period or only on occasional intervals.

The papers which the plaintiff had served on the defendant for divorce, as a matter of fact, never were filed, and such proceedings were abandoned by the plaintiff either before the defendant left for Buffalo or shortly after she returned therefrom. The defendant testified that while she was in Buffalo she executed some papers sent to her for the

conveyance of the real estate of the plaintiff and sent the papers to him. He testified that she had executed no such writings other than the agreements hereinbefore referred to. Whether under the laws of Canada the plaintiff could convey and give full title to real estate owned by him without the defendant as his wife joining in the conveyance we are not advised.

Before the defendant went to Buffalo and when she returned, the plaintiff had in his employ divers and numerous detectives who day and night kept constant watch of the premises occupied by the defendant and observed when and with whom she left the premises and when and with whom she returned and trailed every movement made by her; and about a month after the defendant returned from Buffalo, the plaintiff commenced fresh proceedings before the Canadian Parliament for a divorce upon the grounds of adultery, and in his statement of claim or specifications of particulars he charged her with having committed adultery with 10 or 12 different men, many of whom she did not know and never had met or seen, and including one of the detectives whom the plaintiff had employed to watch the defendant. She answered the charges, denying all of them. At the hearing before Parliament the plaintiff withdrew all of the charges except three and as to such the Senate committee found in favor of the plaintiff, but the House unanimously rejected the findings and dismissed the proceedings. That was in July, 1924. The plaintiff testified that the House so refusing to concur with the Senate was the first time out of 110 cases, and testified that the action so taken by the House was due to "political influence," but did not testify to any facts or circumstances with respect thereto, nor did he intimate how the defendant, a woman of rather obscurity as compared with the prominence of the plaintiff, a barrister and solicitor, could, as against him, exert political or any influence over the House. In defense of his claim of such influence it was shown that even his own counsel, and a member of the House, voted to reject

the findings of the Senate and to dismiss the proceedings.

At about the time, or shortly after, the proceedings for divorce were instituted by him, the plaintiff, on the 28th day of April, 1924, also instituted habeas corpus proceedings in the Supreme Court of Ontario for the custody of the child, in which he alleged *the agreement entered into between him and the defendant on January 20, 1923, the defendant's violation of the agreement to let him have the child at any of the times mentioned in the agreement,* and prayed the custody of the child, until the Senate committee rendered a decision on his application for divorce, or that the child be placed in some independent home until the permanent custody of the child should be determined. Such writ was made returnable May 1, 1924. On that date the defendant appeared and thereupon this order was made and entered in the cause:

"Upon hearing counsel for James Henry Cooke and his wife, Hilda Betty Cooke, and the said Hilda Betty Cooke through her counsel indicating that said infant, Shirley Cooke, shall not be removed from the province of Ontario and that this undertaking is to be in force until such time as the petition of divorce now brought by J. H. Cooke against Hilda Betty Cooke, at Ottawa, has been finally determined, It is ordered, with the consent of counsel for both parties, that the hearing of the application upon the return of the said writ of habeas corpus and for the custody of the said infant, Shirley Cooke, stand over four weeks from this date, subject to its further postponement in case the said divorce proceedings have not then been fully disposed of in the Senate, and that during the interim the said infant, Shirley Cooke, shall remain in the custody of her mother, Hilda Betty Cooke, with the right of the father, J. H. Cooke, to have access to the said child upon reasonable notice at a reasonable time each week."

In pursuance thereof such habeas corpus proceedings were from time to time continued awaiting the action of Parliament on the divorce proceedings. Before the agreement of January 20, 1923, was entered into, the defendant had herself instituted habeas corpus proceedings for the custody of the child and before the last divorce proceeding were instituted before Parliament. The defendant had also caused a

writ to issue against the plaintiff out of the Supreme Court of Ontario for separate maintenance, but which proceedings were held in abeyance awaiting the determination of the divorce proceedings before Parliament; but when such proceedings were terminated on July 24, 1924, she then, within 6 or 7 days thereafter, and on the 31st day of July, 1924, filed in the Supreme Court an amended statement of claim for alimony and separate maintenance, in which she alleged that she, without fault and because of plaintiff's cruel treatment of her, the particulars of which were set forth in her statement of claim, lived separate and apart from him, and that the plaintiff, although able to do so, had, without cause, neglected and refused to maintain and support her, and prayed "a declaration of the court" that she be entitled to alimony from the plaintiff. To such amended statement of claim the plaintiff filed a statement of defense denying all that the defendant had alleged therein, except the marriage and their living separate and apart, and averred that the defendant, after the conclusion of the divorce proceedings before Parliament, had offered to live with him, but that he had rejected the offer, and admitted his liability to pay alimony to her if he did not establish to the satisfaction of the court that the defendant was guilty of adultery. Then he alleged that the defendant had committed adultery with 10 different men, naming them, and that she, during the years 1919 to 1924, had "repeatedly committed adultery with other men" whose names were then unknown to him and that because thereof he was not liable to pay her any alimony. She filed a reply thereto denying each and all of the accusations, and alleged that the plaintiff, after the time alleged by him as to the charges of adultery, had lived and cohabited with her as his wife, to which plaintiff rejoined that whatever cohabitation was had between them after such time was without knowledge of some of the alleged adulterous acts, and that others were revived by the defendant's conduct subsequent thereto. Such issues came on for trial before the court and on the 14th day of January,

1925, the judge, trying the case, indorsed and directed this judgment:

"Judgment. 1. Declare that issue between the parties to be dealt with as if the writ had been issued immediately prior to the delivery of the statement of claim.

"2. Action dismissed. No order as to costs.

"John F. Orde, J. A.

"Toronto, 14th January, 1925."

Such direction of judgment was duly filed in the Supreme Court of Ontario, and in accordance therewith this judgment was entered and filed:

"In the Supreme Court of Ontario.

"To the Honourable Mr. Justice Orde:

"Wednesday, the 14th day of January, A. D. 1925.

"Between: Hilda Betty Cooke, Plaintiff, and James Henry Cooke, Defendant.

"1. This action coming on for trial on the 8th day of December, A. D. 1924, and continuing on the 9th, 10th, 11th, and 12th days of December, 1924, and the 12th, 13th, and 14th days of January, A. D. 1925, before this court at the sittings holden at the city of Toronto for trial of actions without a jury, in the presence of counsel for both parties, upon hearing read the pleadings and hearing the evidence adduced and what was alleged by counsel aforesaid, and counsel for both sides consenting to the trial of this action as if the writ of summons had been issued immediately prior to the delivery of statement of claim therein.

"2. This court doth declare that the issue between the parties hereto be and the same is dealt with as if the writ of summons in this action had been issued immediately prior to the delivery of the statement of claim filed and served herein.

"3. And this court doth order and adjudge that this action be and the same is hereby dismissed without costs.

"Judgment signed the 12th day of February, A. D. 1925.

"E. Harley, Senior Registrar, A. C. O."

On January 15, 1925, she took an appeal to the divisional court from the judgment of dismissal dated the 14th day of January, 1925, and on the 15th day of May, 1925, on motion of her counsel, the appeal was dismissed.

We have thus recited the substance of all that appears by the judgment roll of that cause and put in evidence in this proceeding. The plaintiff, however, also offered in evidence a copy of the transcript of the evidence adduced and taken in such alimony action, certified to only by the official stenographer or reporter who reported such proceeding, and a copy of the oral opinion of the judge who tried the case and delivered by him at the conclusion of the evidence, which also was certified to only by the official reporter, who stenographically reported the opinion as it was delivered and thereafter transcribed by him; but which opinion was not, nor was the transcript of the evidence, filed in the cause or otherwise made of record. The referee admitted the judgment roll in evidence, but on the defendant's objections rejected the offered copy of the transcript of the evidence and of such oral opinion. The referee, however, permitted such transcripts to be identified and exhibited in the record for our consideration and review if deemed competent and material by us. We shall presently refer to them.

When the defendant filed her amended statement of claim in the alimony action, thereafter this further order was made in the habeas corpus proceedings instituted by the plaintiff for the custody of the child:

"Custody of Child.—Habeas corpus proceedings are adjourned indefinitely. By consent the habeas corpus proceedings taken by J. H. Cooke to secure custody of 3 year old Shirley Cooke have been adjourned sine die to be brought on at any time upon 2 days' notice. The proceedings which are against the mother of the child, Mrs. Betty Cooke, were commenced before divorce proceedings were instituted by Mr. Cooke and were allowed to stand till after the divorce application was disposed of. That was recently refused. The habeas corpus proceedings will now await the outcome of the alimony action in which Mrs. Cooke claims $50 a week. In the meantime the child is not to be removed from the jurisdiction of the court."

Such order was made on August 7, 1924, or some time thereafter. The habeas corpus proceedings and the alimony action were before different judges or courts.

On the 14th or 15th day of January, 1925, the defendant and her mother, with the child and without the knowledge or consent of the plaintiff, departed from the Dominion of Canada and went to Reno, Nev., arriving there on the 20th day of January, 1925. Counsel for defendant, who had represented her in the habeas corpus proceedings, instituted by the plaintiff, died in July, 1924. Counsel for plaintiff, on January 17, 1925, served counsel who had represented the defendant in the alimony action with notice that on the 20th day of January, 1925, a motion would be made to take up the further hearing of the habeas corpus proceedings. Such counsel represented to the court that they were employed and authorized to appear for the defendant only in the alimony action, and not in the habeas corpus proceedings and at no time appeared for or represented the defendant in such proceedings, and hence stated that they could not and declined to accept service, or to enter any appearance therein for her, but represented to the court that they had mailed the copy of the notice served upon them to the defendant at her place of abode in Toronto, but that the copy so mailed was returned to them undelivered. On the 15th day of January, 1925, plaintiff made and filed an affidavit in such cause, stating: That since the death of defendant's counsel in the habeas corpus proceeding there was "no solicitor on the record in this particular matter and no person on whom papers can be served, and I am advised by my counsel that it is necessary for me to apply for another writ of habeas corpus because of the above facts"; that he had received information that the defendant had moved out of her apartments and sold the contents to a furniture dealer, and that the defendant had proposed "going away a long distance and taking the child with her, and that she had borrowed $1,000 from her aunt." On the 19th day of January, 1925, the plaintiff made and filed another affidavit in such cause, in which he again averred that the defendant had vacated her apartments on the 15th of January, 1925, and on the night before had sold the furniture to a second-

hand dealer, and that "I have had efforts made to serve Mrs. Cooke at every possible place where she might conceivably be in Toronto, with no result;" and that on the 18th he went to Buffalo, N. Y., and learned that the defendant, her mother, and the child were there seen several days before in a railway station. Notwithstanding the facts so averred by plaintiff, and without any further or other service of notice or process, he, in the habeas corpus proceedings instituted by him, took an order awarding the custody of the child to him, "until the further order of the court," but in which is also recited that the defendant could move against it as she might desire or be advised.

On March 3, 1925, the plaintiff, in the criminal court of Canada at Toronto, filed a complaint and caused a warrant to issue against the defendant, charging that she, in January, 1925, "unlawfully received" the child "knowing it to have been unlawfully taken with the intent to deprive James Henry Cooke, the parent of the said Shirley Cooke, of the possession of said child." And on March 30, 1925, he filed a further complaint and had another warrant issued against the defendant, charging that she, with the intent to deprive the plaintiff, "the parent of the child," of its possession, "unlawfully took and enticed away and detained" the child. Neither in such complaints nor in the warrants was it disclosed that the defendant was the mother and herself a parent of the child. The warrants were not served. A thousand or more printed circulars for the arrest of the defendant were sent out and distributed to various officers in Canada and in the United States and published in some newspapers. In June, 1925, plaintiff, through detectives in his employ, learned that the defendant and her mother and the child were at Reno, Nev., where they, from January 20, 1925, resided and remained in an apartment there occupied by them. The plaintiff at San Francisco, Cal., on June 26, 1925, also filed a complaint with the federal authorities, charging that the defendant and the child had entered the United States in violation of the immigration laws; that

they had entered without inspection, and that there was no record of the entry of the child at various ports on the eastern border, and that the child was likely to become a public charge and was not in possession of an immigration vise, and prayed that they be deported to Canada. In June, 1925, with a secret service man, the plaintiff went to Reno and there caused the arrest of the defendant and the child on the street on a Sunday as they with the defendant's mother were returning from church. The service man arresting the defendant had only a telegraph warrant in code and attempted to take her on such warrant immediately to San Francisco. She protested and quite a scene was created on the street. Her friends at Reno and several attorneys there came to her rescue. She, on such warrant, nevertheless, was taken to jail at Reno, where she and the child were confined for several days. Upon her appeal to the local authorities she was finally released on giving bail in the sum of $1,500 for her appearance with the child at San Francisco to answer the charge there preferred against them. In obedience thereto the defendant, with the child, accompanied by her mother, went to San Francisco. As soon as they arrived there the plaintiff filed a charge for deportation also against the mother. There the defendant, her mother, and the child were detained and held in custody by the Immigration Bureau until they gave additional bail in the sum of $3,000. They had some difficulty, but finally were successful in giving the bail. While the defendant was there so detained and before the hearing was had or completed, the plaintiff at San Francisco instituted habeas corpus proceedings in the superior court of California against the defendant for the custody of the child, basing his right thereto alone on the alleged Canadian judgment in the habeas corpus proceedings whereby, as he alleged, the child was awarded to him on January 26, 1925, and caused the writ to be served upon the defendant while she was there so detained at San Francisco by the federal authorities. Her attorneys there advised her that under the circumstances

she was privileged and immune from service of civil process while attending the hearing and in the custody of the officers of the United States, and that the state court of California, for such reason, had not acquired jurisdiction of her person. The immigration officials at San Francisco were not empowered themselves to make any order of deportation. They but took the evidence and reported it to the Secretary of Labor at Washington, D. C. After the deportation hearing and pending such proceedings at Washington, the defendant, her mother, and the child, being still held, but released on their bail bonds, on the advice of counsel, went back to Reno. In the meantime their counsel at San Francisco had entered an appearance in the habeas corpus proceeding, and alleged the facts and circumstances of the defendant's arrest and detention in the deportation proceedings and made claim of privilege and immunity from service of process upon her from the state court, alleging the particulars thereof, but the superior court, without passing upon such claim, proceeded with the case, and thereupon defendant's counsel applied to the District Court of Appeals and obtained an alternative writ of prohibition restraining the superior court from further proceeding. The superior court concluded the hearing, but withheld rendition of judgment until the matter of prohibition was disposed of in the Court of Appeals. On July 27, 1925, the Court of Appeals rendered an opinion (239 P. 381) denying the writ, holding that the claim of immunity from service of process did not ipso facto divest the superior court of jurisdiction, but that such alleged immunity was only a privilege which may or may not be claimed and under some circumstances was waivable, and hence was within the power of the superior court to hear and determine; on August 26, 1925, the Court of Appeals denied a rehearing; and on September 24, 1925, the Supreme Court of the state denied a hearing on the matter. Then, on September 29, 1925, the superior court, *before a decision was rendered in the deportation proceedings,* and without passing on or adjudging the question as to

the alleged claim of privilege or immunity, and as though no such claim had been interposed, made and entered an order that the custody of the child be taken from the defendant and "forthwith" delivered to the plaintiff. At that time, and for more than three months prior thereto, the defendant and her mother, with the child, were at Reno awaiting the determination of the deportation proceedings at Washington.

On the 22d day of October, 1925, the defendant, having resided at Reno for a period of nine months, in the district court of Nevada, in and for the county of Washoe, at Reno, filed her verified complaint against the plaintiff, as the defendant therein, in which she, among other things, alleged that she for more than six months prior thereto had been and then was a bona fide resident of such county and actually and physically domiciled therein; that the defendant therein was guilty of extreme cruelty, alleging the particulars thereof; and that she was and that he was not a fit and suitable person for the care, custody, and control of the child, and prayed a dissolution of the bonds of matrimony and that she be awarded the care, custody, and control of the child. Upon her affidavit filed in the cause an order for publication and service of summons was had as by the laws of Nevada provided, and on the 10th day of November, 1925, summons and a copy of the complaint were personally served on the defendant therein at Toronto and due return thereof made and filed in the cause. The defendant therein appeared in the action on the 21st of December, 1925, before the time for appearance had expired, and filed a notice to quash the service of summons, on the ground that the court was without jurisdiction of the action, because as alleged by him, neither the plaintiff nor the defendant was a resident of Nevada, when the complaint was filed, and that the names of the attorneys for plaintiff therein were indorsed on the summons, not in their own handwriting, but only in typewriting as "Roberts & Scanlon, plaintiff's attorneys," and in like manner certified to the copy of the complaint served on him, and alleged that, as the time to further plead

in the cause would expire before the motion could be heard, he applied for and obtained an order giving him 15 days to further plead after the motion to quash was disposed of, and served and filed a notice to take up the motion on January 11, 1926. Plaintiff's counsel thereupon served a notice to take up the motion on December 29, 1925. On the day last mentioned both parties appeared before the court; the defendant's counsel therein urging that he was not then prepared to take up the motion and that it be not heard until January 11th, while plaintiff's counsel therein urged that it be then heard and as noticed by him. The court offered to give defendant's counsel another day to present his motion, but counsel declined to accept the offer or any time short of January 11th. The court admonished counsel that the motion to quash was his motion filed on the 21st of December, 8 days before, and that he ought to be prepared to present it on December 29th or the next day, and declined to give counsel any further time to do so. Then a controversy arose as to the effect of the ex parte order had and obtained by defendant's counsel before another judge of the district, reciting, among other things, that the filing of the defendant's motion therein and the service of notice to quash the issuance and service of summons, *and applying for and obtaining an order to further plead within* 15 *days after the motion to quash was determined,* as to whether such an appearance was special or general. The court ruled that the question of whether such an appearance was special or general ought not to have been determined in such an ex parte manner and without giving opposing counsel an opportunity to be heard with respect thereto, and hence, in such particular, set the order aside before hearing the motion to quash. Counsel for defendant then observed that unless the order, giving him 15 days to plead after the determination of the motion to quash was heard, remained as made, his time to further plead, in the event the motion to quash was overruled, had expired. The court then stated that, in the event the motion to quash

was overruled, he would give counsel for defendant a reasonable time to further plead. Counsel for defendant declined to accept such offer, and declined to present his motion at that time, insisting that the motion be not heard until January 11th. Upon further colloquy between court and counsel the court overruled the motion to quash, holding that the stated grounds of the motion, that the plaintiff therein was not a resident of Nevada, could not be raised on a motion to quash the issuance and service of summons any more than any other material and essential allegation of the complaint, and that not anything was presented by defendant in support of such ground of his motion, and that the other grounds stated in the motion were "puerile." The court again offered to give counsel for defendant time to further plead, but counsel declined to accept the offer, and declined to further plead; and the time to plead to the complaint having theretofore expired, on motion of plaintiff, the default for failure to plead to the complaint was duly entered and the cause set for trial on the 31st day of December, 1925, at which time the court heard the testimony of plaintiff and her witnesses and made and filed findings of fact, finding the defendant therein guilty of extreme cruelty and as in the complaint alleged; that the plaintiff therein, for more than six months prior to the commencement of the action, had been and then was, a bona fide resident of and actually and physically resided in the county of Washoe, Nev.; that the plaintiff therein was, and that the defendant therein was not, a fit and proper person to have the care, custody, and control of the child, and found all of the material allegations of the complaint to be true, and found that the complaint was filed on the 22d day of October, 1925, summons issued and personally served on the defendant therein at Toronto on the 10th day of November, 1925; that on the 21st day of December 1925, he, by his counsel, "filed in this court and cause an appearance, and thereupon on the same day filed a notice of motion and motion to declare void the order for publication of summons and quash the

summons, and upon motion of Roberts & Scanlon, attorneys for plaintiff, the said notice of motion and motion to declare void the order for publication of summons and quash the summons, and upon motion of Roberts & Scanlon, attorneys for plaintiff, the said notice of motion and motion to declare void the order for publication of summons and quash service of summons coming on regularly to be heard on the 29th day of December, 1925, and the court, after hearing the arguments of counsel for plaintiff, and counsel for defendand having stated in open court that he did not desire to argue said motion or to submit any authorities to the court in support thereof, overruled the motion, and counsel for defendant stating he did not desire further time to plead, therfore, upon motion of M. J. Scanlon, Esq., one of the attorneys for plaintiff, the default of the defendant for failure to answer or otherwise plead within the time required by law was duly entered upon the minutes of this court, and that thereafter, on the 31st day of December, 1925, the cause was set down for trial," at which time the court, on a hearing, rendered and entered judgment dissolving the bonds of matrimony, and granted the plaintiff therein the care, custody, and control of the child. Before such judgment was rendered, the deportation proceedings had been dismissed at Washington by the Secretary of Labor, and the defendant, her mother, and the child discharged. The plaintiff himself, in substance, testified that, the defendant not being subject to extradition, he resorted to the deportation proceedings to get the custody of the child, and that further than that he was not concerned in having either the defendant or her mother deported.

After the divorce action in Reno was commenced, and while the deportation proceedings at Washington were pending, the defendant and her mother, with the child, on the the advice of her counsel at Salt Lake City who represented them at Washington, temporarily came to Salt Lake City, and there occupied apartments. The defendant thereafter came under the surveillance of the sheriff's office of Salt

Lake county upon learning who Mrs. Cooke was. One of the deputies, a son of the sheriff, testified that he kept surveillance of Mrs. Cooke's conduct with one Earl Welch, a married man, at the instance and request of the wife of Welch. He testified that he visited about the defendant's premises and went upstairs to the door of her apartment "eavesdropping" to ascertain what he could see and hear, and that he heard the voice of Welch in the room with the defendant and her mother; that on one occasion, about 12 o'clock at night on November 23, 1925, he saw Welch drive up to the apartment in his automobile and saw him and the defendant leave and drive down the street to the southern part of the city and there stop at a refreshment stand, where they got sandwiches, and then returned to the apartments, where the deputy left them, but later came back when he saw Welch leave with his car about 3 o'clock in the morning; that he saw Mrs. Cooke the next afternoon on the veranda of her apartments and saw Welch and a Mr. and Mrs. Amussen leave in the car; that he later that night, about 9 o'clock, saw Welch, Mr. and Mrs. Amussen, and Mrs. Cooke leave the apartments, get into the car, and drive to a cafeteria, but soon left it; that he did not know where they went, but that he found them again at the cafeteria at about 11 o'clock; that he remained there and saw them dance; that he left the cafeteria at about 12:15 and after that saw Welch, Mrs. Cooke, and the Amussens at about 1 o'clock at the residence of the Amussens in the automobile; that he saw the Amussens leave the car and Welch and Mrs. Cooke drive away; that he followed them, but lost them for something like a half hour, or less, and when he again found them the Welch car with the back curtains drawn was stopped on the boulevard known as the Wasatch Drive facing and overlooking the city; that he, in his car, drove past the Welch car about a block and a half and then got out and walked back, and as he approached the Welch car he saw Welch and Mrs. Cooke get out of the automobile from the rear seat and get into the front seat and drive away

and that he followed them; that, while thus pursuing them, Welch turned his car and pursued the deputy, who tried to get away, but that Welch overtook him when the deputy turned his car into an alley and stopped, whereupon Welch drove up and inquired of him why he was following him, and the deputy replied by asking Welch why he followed him. The deputy further testified that not until November 23d had he learned for certain that the defendant was Mrs. Cooke (she and her mother having, in Salt Lake, gone under an assumed name) and that, when on the next night he pursued Welch and Mrs. Cooke and the Amussens, Mrs. Bowman, the defendant's mother, was and remained at the apartments with the child.

Mr. Amussen, who for 8 or 10 years was manager of the First National Mortgage Bond Company, and his wife, testified that they, for many years, were well acquainted with Welch, and that they had met the defendant and her mother several times before that night; that on the night testified to by the deputy they, with Welch and Mrs. Cooke, Mrs. Bowman remaining at the apartments with the child, left the apartments between 8 and 9 o'clock in the evening and drove around the business portions of the city and later went to a cafeteria, there had refreshments and danced, and about midnight, or thereafter, all of them left and drove to the residence of the Amussens, when a suggestion was made that all of them drive on the boulevard to show the defendant the view of the city and the valley below all lit up at night; that the Amussens suggested that they had left their children alone and for that reason thought they would not longer leave them; that thereupon the Amussens left the automobile, and Welch and Mrs. Cooke drove away in the direction of the boulevard a few blocks away; that the curtains in the rear or back of the automobile where the Amussens were seated were drawn earlier in the evening and remained drawn when they left the car.

The defendant testified that, when she and her mother were arrested in Reno on the deportation proceedings, Welch

and his father, who were then strangers to her, and who were in Reno on business, among others, volunteered their services in her behalf, and that, when she and her mother thereafter came to Salt Lake where the Welches resided, they and her counsel were the only persons whom she knew in Salt Lake, and that after they got there she and her mother continued their acquaintance with them; that on the night when she went riding with Welch and the Amussens, and after the Amussens left the car at their residence, Welch drove on the boulevard; that they halted but a few minutes looking over the city and then drove down to the street where her apartment was, and as they approached the apartment they discovered that some one was following them; that believing, as she did at the time, that it was some one at the instance of the plaintiff, she requested Welch to turn and follow the car to observe, if they could, who it was; that Welch did so and finally overtook the car and got its number; that they did not then know who it was, the occupant telling them that he was a "bootlegger"; but later Welch discovered that the car was from the sheriff's office. She denied that any improper relations at any time existed between her and Welch. She further testified that on the next night, two other deputy sheriffs, after 12 o'clock at night, came to her apartment where the defendant and her mother and the child were alone, and after they had retired, and that one of the deputies entered the veranda, and that the other deputy, without a warrant or process of any kind, and without even requesting or demanding admittance, broke in the door of the apartment and entered with a flash light and seized the defendant's mother by the arm and threw her to the floor and struggled with the defendant, who had thrown herself over the body of the child on the bed, and that upon neighboring occupants coming to the scene because of the outcries of the defendant and her mother the deputies went away. But on the next day she and the child were taken into custody on a complaint filed by the sheriff in the juvenile

court charging her with juvenile delinquency and as heretofore referred to.

While the plaintiff testified that he had not anything to do with such arrest, yet testified that he in Toronto was in communication with the sheriff at Salt Lake City 2 or 3 days before the arrest and had received information from the sheriff that the defendant "was said to be in Salt Lake City," but that he did not know of the arrest until the chief of detectives at Toronto phoned him at about 11 o'clock at night that he had a wire from Salt Lake City that Mrs. Cooke was arrested for "contributing to juvenile delinquency," and that the officers at Salt Lake City "wanted particulars," and that the plaintiff told the chief "to send out the information"; that the chief asked the plaintiff if he "would stand the expenses of a telegram to Harries (the sheriff of Salt Lake county) explaining the warrant and so on, and I said, 'Go ahead, I authorize that expense,' " and that he then wired his attorney at San Francisco to "go to Salt Lake and do what you can," and "I gave him wide open instructions"; and, when the defendant applied to the district court for a writ of habeas corpus, counsel for plaintiff, in connection with the county attorney, appeared for and on behalf of the probation officer in resisting the writ.

It, of course, is apparent that the defendant was not guilty of any juvenile delinquency. The record, without dispute, shows that she at all times had taken good care of the child. The referee so found. On the night that she was out driving with the Amussens and Welch and was trailed by the deputy sheriff, the deputy himself testified that the child at the apartments was in the care of the defendant's mother. The record is wholly barren of any claim of juvenile delinquency or neglect. According to the testimony of the deputy he pursued the defendant with no such purpose or object, but, as he testified, at the request of the wife of Welch to watch him and to get something on him. In pursuing Welch and Mrs. Cooke it is obvious that the deputy did not discover anything of importance, for Welch was in no particular

molested or disturbed; but on the next night the defendant's premises, without a warrant or process, were broken into and entered as hereinbefore described, and on the next day, November 25, 1925, the defendant was arrested on the complaint of the sheriff, and the child turned over to the probation officer. In such connection it is significant that the deputy as testified to by him did not know for certain who Mrs. Cooke was until the 23d when his surveillance of her began, and still more significant is it, and as testified to by the plaintiff, that about 2 or 3 days before the defendant's arrest he, in Toronto, was in communication with the sheriff, who wired him that it "was said that Mrs. Cooke was in Salt Lake," and immediately upon her arrest the sheriff wired to the chief detective at Toronto "for particulars" and that the chief wired back to him at the request and expense of the plaintiff. The conclusion is inevitable that the inducing cause leading up to the arrest of the defendant was not because of any juvenile delinquency, nor of any improper relations between her and Welch, but to take the child from the custody of the defendant for the benefit of the plaintiff and to enable him to get its custody. And whatever doubt there may be as to such conclusion is set at rest by the amended complaint filed by the sheriff after these proceedings were commenced, wherein, as justification for the taking and detention of the child from the defendant, he alleged that the custody of the child was awarded to the father, the plaintiff herein, by the courts of the Dominion of Canada having jurisdiction of the parties, and that the child was surreptitiously removed from the custody and jurisdiction of the courts of Canada by the mother, and that the courts of California had awarded the care and custody of the child to the plaintiff, and that the defendant had surreptitiously removed it from the jurisdiction of the courts of California, and that the courts of Canada and of California, upon evidence introduced before them, had found that the defendant was an improper person to have the care and custody of the child.

When the issues in this case were joined, this court, pending the proceedings and until the further order of the court, placed the child in the custody of the sheriff. While the child and the defendant were so in the custody of the sheriff, Welch, at the invitation of one of the sheriff's sons and a deputy sheriff, called at the sheriff's residence and was invited in the house where the defendant was, and the deputy testified that he told Welch that "at any time he was around that way if he wanted to come in to come in," and that the first time that Welch came he came at his invitation; that Welch on several occasions, but not alone, took the defendant riding, but that some one of the sheriff's family always accompanied them, and that when Welch was at the house he and the defendant at no time were alone, but always in the presence of members of the sheriff's family, and that on none of such occasions had he observed any undue or improper familiarity between the defendant and Welch. The referee, who heard and had before him all of the witnesses who testified concerning the relations between the defendant and Welch, found that Welch had "taken advantage of her condition and forced his attention upon her, but there is no evidence of even a suspicion of any improper relations between them."

We approve the finding that there is no sufficient evidence to show any such relations, and it is quite apparent that, if the sheriff or his deputies believed that any improper relations existed between the defendant and Welch, Welch would not have been permitted to visit the defendant at the sheriff's residence, much less would not have been invited to come there. The defendant may have been indiscreet at that hour of the night driving with Welch on the boulevard after the Amussens left the automobile, but she ought not, for that reason, be characterized as an immoral woman or as unfit to have the custody of the child.

We approve the finding of the referee that the defendant is a woman of intelligence and refinement and has had the care and custody of the child since its birth, and that she at

all times has well cared for it, and that she and the child are devotedly attached to each other, and that to take the child from the defendant and give it to the plaintiff and his sister who are comparative strangers to the child would endanger the happiness and welfare of the child, and that the defendant, with the assistance of her mother and the latter's husband, who are willing and able to provide a home for the defendant and the child, can properly provide for and rear the child and provide for its comfort, contentment, and intellectual and moral development, and that the defendant is a fit and proper person to have the care, custody, and control of the child. We also approve the finding that the mother of the defendant is a woman of good character and reputation, and that the defendant since her departure from Canada has not been guilty of any immoral conduct or wrongdoing, and that she since then, as before, has taken good care of the child.

We also approve the finding that the plaintiff is willing and able to give the child a good home in charge of his sister (an unmarried woman about 50 years of age), and that he is well able financially to maintain and educate the child. But, as between the plaintiff and the defendant, we, on the record find that the defendant is more fit and suitable than is the plaintiff to have the care, custody, and control of the child, and that it is to the best interests of the child to leave it with the defendant, and not take it from her and give its exclusive custody to the plaintiff, who, if given its custody, will take the child from the jurisdiction of this court and from the United States and into Canada, where the defendant, who has had its care and custody since its birth, and who has become a resident of this country, will be denied all access to the child, and where, as asserted by plaintiff, she is barred not only of all right of custody, but also of all access to the child. We thus think the child should be left in the custody of the defendant, unless some one or more of the prior proceedings preclude us from such determination.

It is urged by the plaintiff that in the alimony action in

Canada the defendant was adjudged guilty of adultery and that under the laws of Canada such a judgment bars defendant from all right to the custody of or access to the child. But on the face of the judgment roll in that action, hereinbefore referred to, it does not appear that the defendant was adjudged guilty of adultery. For that reason the plaintiff in this proceeding offered in evidence the transcript of the official stenographer's notes and certified to by him only, in such alimony action, as well as the oral opinion delivered by the judge, which also was transcribed and certified to only by the official stenographer. But neither the transcript of the evidence nor the oral opinion was filed or otherwise made of record in such cause. The transcript of the evidence shows that considerable indirect evidence of a circumstantial character was given on behalf of the plaintiff that the defendant at different times associated with 3 different men under circumstances where adulterous relations could have been had with them and where an inference could be drawn that such adulterous acts occurred, and that considerable direct evidence was given on behalf of the defendant and of her witnesses that no such or any adulterous acts were committed by her. The oral opinion of the judge who heard the case shows that the court, not from any direct evidence, but from circumstantial evidence, found that the defendant had committed adultery with each of such 3 men, and seemed to be influenced in such conclusion because the defendant did not call any of such men as witnesses to deny the charges, and, since she did not do so, the court drew the inference that she was afraid to call them lest their testimony be against her. Such reference to such transcript and opinion is here made merely to show the nature or character of them and to properly review the ruling of the referee in excluding them and are referred to in this opinion for such purpose only.

When such transcripts of the evidence and of the opinion were offered in evidence in these proceedings, and on objections of counsel for the defendant to the admission of them,

the referee inquiring of counsel for plaintiff on what theory he claimed the admissibility of such evidence, counsel replied that he claimed it admissible under sections 7089 and 7090, Comp. Laws Utah 1917. The referee, looking at the sections, observed that the offered documents did not come within any of such provisions and excluded them. An examination of them clearly shows that they do not and that they were properly excluded. Section 7089 provides:

"A judicial record of a foreign country may be proved by the attestation of the clerk, with the seal of the court annexed, if there be a clerk and seal, or of the keeper of the record, with the seal of his office annexed, if there be a seal together with a certificate of the chief judge or presiding magistrate, or minister or ambassador, or a consul, vice consul, or consular agent of the United States in such foreign country, that the attestation is in due form and by the proper officer."

Section 7090, provides:

"*Other Proof*. A copy of the judicial record of a foreign country is also admissible in evidence upon proof: 1. That the copy offered has been compared by the witness with the original, and is an exact transcript of the whole of it; 2, that such original was in the custody of the clerk of the court, or other legal keeper of the same; and, 3. that the copy is duly attested by a seal which is proved to be the seal of the court where the record remains, if it be the record of a court; or, if there be no such seal, or if it be not a record of a court, by the signature of the legal keeper of the original."

The judgment roll as hereinbefore referred to, and which the referee admitted in evidence, was attested and certified to by the senior registrar of the Canadian court with the seal of the court annexed, and made such attestation and certification as the custodian of the records of the court, and therein certified that such roll contained a true copy of the writ of summons, pleadings, and of the "judgment made by said court and bearing date January 14, 1925." the judgment heretofore referred to that the action be dismissed. And such registrar, with respect to such judgment roll, further certified:

"That the said transcript has been carefully compared with the original writ of summons, record, and notice on file and judgment and

order as entered of record in the books in the said central office and is a true transcript thereof, and that I am an officer duly authorized to give this certificate."

The opinion of the judge or court so offered in evidence is not included in such transcript, nor certified to by the registrar; nor is it in any manner therein referred to; nor was it ever filled with the registrar or in his office; nor did it ever become a part of the records of the court; nor was it ever in the custody of the registrar; nor was it ever attested by him; nor was the seal of the court annexed thereto. That also was true with respect to the transcript of the evidence which also was certified to only by the official stenographer. It, however, is suggested by counsel for the plaintiff that, under the Canadian practice, findings, though permitted, are not always required, and that the opinion may be regarded in the nature of findings. But no matter what the document may be called, whether findings, oral opinion, or what not, it at no time was filed or became a part of the records of the court and never was in the custody of the registrar of the court and was not attested nor certified to by him.

We are therefore of the opinion that the referee correctly excluded the offer of such evidence, and that we may not properly notice or consider it, and that all there is properly before us for consideration with respect to the alimony action in the Canadian court is the judgment roll as hereinbefore referred to and as certified to and attested by the registrar of that court. And we say here as was said by the Supreme Court of the United States in the case of *Lander* v. *Mercantile Bank*, 186 U. S. 458, 22 S. Ct. 908, 46 L. Ed. 1247:

"But the final question is, What was the 'thing adjudged' in the prior cases? The answer to the question is found in the pleadings in those cases and in the judgments which were entered."

Thus, looking at the judgment roll alone and at the pleadings and judgment as entered, it is not made to appear on the

face of the record that the defendant was there found or adjudged guilty of adultery. True, on the face of the pleadings the issue of adultery was tendered and the court thereunder could have tried and determined such issue. But the pertinent inquiry here is, not what the court in such respect could or might have decided, but what was actually decided and determined as appears *by the pleadings and the judgment as entered.* Looking at the judgment as attested and certified to by the registrar, the proper custodian of the record, and not what was certified to merely by the stenographer or reporter, we but find that the court ordered and adjudged that the action be dismissed, without indicating whether it was on a finding against the statement of claim of the plaintiff therein or on a finding in favor of the affirmative statement of defense of the defendant therein, and there is nothing on the face of the properly certified and attested record to show whether the dismissal was upon the one ground or the other.

And then, too, it must further be noticed that, while the parties there were the same, still the whole issue, and the claims and demands of the parties, were entirely different from the issues, claims, and demands here presented and made. There the ultimate question and the only question presented and decided was one of alimony. Here it is the custody of the child; and it here is admitted that the latter was not involved in the former litigation, and that too plainly appears from the properly certified record. The matter thus comes within the rule announced by the Supreme Court of the United States in the much cited and followed case of *Cromwell* v. *County of Sac,* 94 U. S. 351, 24 L. Ed. 681, wherein that court said:

"There is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a *different claim or cause of action.* In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the *claim or demand in controversy,* concluding parties and those in

privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. * * * But where the second action between the same parties is upon a *different claim or demand,* the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a *different cause of action,* the inquiry must always be as to the point or question *actually litigated and determined* in the original action, not what *might have been* thus litigated and determined. Only upon such matters is the judgment conclusive in another action."

That case in such respect was approved and followed in the case of *Last Chance Min. Co.* v. *Tyler Min. Co.,* 157 U. S. 683, 15 S. Ct. 733, 39 L. Ed. 859, and in *New Orleans* v. *Citizens Bank,* 167 U. S. 371, 397, 17 S. Ct. 905, 42 L. Ed. 202, and in many other cases. Thus from such considerations the Canadian judgment in the alimony action presents here no bar or estoppel, and in no particular concludes the parties as to the issues here presented.

Though the defendant, by the Canadian court, had been found guilty and adjudged guilty of adultery, and though full faith and credit be given to such a judgment, and while such a judgment would in Canada have the effect to deprive the defendant from all right to the custody of the child and of access to it, still such would not necessarily be the case here where the laws of this country and of this jurisdiction are different. It is conceded by all parties concerned that the alimony action in Canada did not involve the custody of the child. In such respect it is merely asserted that she, having been found and adjudged guilty of adultery thereby, was no longer entitled to the custody of the child in Canada, and that, upon further proceedings based upon such judgment, the custody of the child could there be taken from her. But what is the situation when the defendant is found here in this country with the possession

and custody of the child and where it is sought to take such possession and custody from her? In such particular will the law of Canada or the law of this jurisdiction apply? In this country the general rule is that a spouse, though found or adjudged guilty of adultery, will not, for such reason, necessarily be deprived of the care and custody of his or her children (*Haskell* v. *Haskell*, 152 Mass. 16, 24 N. E. 859; *Ex parte Lincoln*, 128 La. 278, 54 So. 818; *Brogna* v. *Brogna*, 67 Wash. 687, 122 P. 1; *Richardson* v. *Richardson*, 36 Wash. 272, 78 P. 920), and especially where it is shown that *the adulterous relation had ceased, or would not be repeated, or the morals of the child or children not affected thereby.* And such is the effect of our statute, under which, different from the laws of Canada, the mother, in case of separation of husband and wife, instead of the father, is given the paramount right to the care, custody, and control of minor children. It (section 3004, Comp. Laws Utah 1917) provides:

"In the case of the separation of husband and wife having minor children, the mother of said children shall be entitled to the care, control, and custody of all such children; provided, that if any of said children have attained the age of twelve years and are of sound mind, such children shall have the privilege of electing to which of the parents they will attach themselves; provided further, that if it shall be made to appear to a court of competent jurisdiction that the mother is an immoral or otherwise incompetent or improper person, then the court may award the custody of said children to the father or make such other order as may be just."

Thus, though it be assumed that the Canadian Court, in the alimony action, found and adjudged the defendant guilty of adultery, and though full faith and credit be given to such judgment, yet, under the laws of this country and under our statute, the paramount question still remains what disposition of the custody of the child is for its best interest and welfare? By holding that such interest is best subserved and protected by leaving the child with the defendant does not in any particular discredit or impair such Canadian judgment, though it be considered and regarded as finding

and adjudging the defendant guilty of adultery, for admittedly the right of the defendant to the custody and control of the child was not involved in that action nor settled by that judgment; nor ought the child's rights be concluded or prejudiced by it, for its welfare is a matter of paramount consideration at all times and under all circumstances.

Now as to the pleaded judgment in the habeas corpus proceedings under date of January 26, 1925, whereby it is claimed the custody of the child by the Canadian court was awarded to the plaintiff: As is shown by the transcript of the judgment roll attested and certified to by the registrar of the court, such proceedings, on or after August 7, 1924, were "adjourned sine die to be brought on at any time upon 2 days' notice"; that on January 17, 1925, attempt was made to serve notice that on January 20th a motion would be made to bring on the further hearing in such cause, but no notice was served, the plaintiff therein by affidavit averring that because of the defendant's departure from Canada he was unable to serve notice on her and since the death of her counsel in July, 1924, who had theretofore represented the defendant in such action, there was no counsel of record, nor any other person, on whom notice could be served, and for such reason he was advised by his counsel that it was necessary for him to apply for another writ; but the record as certified to by the registrar shows that he did not do so, and that the plaintiff, without service of any notice, on January 26, 1925, took an order that the defendant "forthwith deliver" the child "into the custody of the petitioner to remain in his care and custody *until the court or a judge shall make other order to the contrary. And it is ordered that the said Hilda Betty Cooke be at liberty to move to rescind this order as she may be advised.*" All this appears on the face of the judgment roll as attested and certified to by the registrar. As plainly appears by the language of the order, the defendant could appear before the Canadian court and move that court to rescind the order, which, as is seen, is not a final but merely

an interlocutory order. Thus, assuming that notwithstanding the want of service as to the revival of the proceedings the court had jurisdiction, and giving the order full faith and credit, we, nevertheless, are not required to give it any greater effect than the Canadian court itself could give it, and if that court could rescind or modify such interlocutory order, so can we without in any particular discrediting the order. In *Lynde* v. *Lynde,* 162 N. Y. 405 56 N. E. 979, 48 L. R. A. 679, 76 Am. St. Rep. 332, the New York court held that the provisions of the federal Constitution which require full faith and credit to be given judicial proceedings of another state "relate to judgments, or decrees, which not only are conclusive in the jurisdiction where rendered, but which are final" therein. That ruling was followed in *People* v. *Multer,* 107 Misc. Rep. 58, 175 N. Y. S. 526, where it was held that the full faith and credit clause did not apply to interlocutory orders, or to an order made by a New Jersey court awarding the custody and possession of a minor child to one of the parents "until the further order of the court." And in *Heavrin* v. *Spicer,* 49 App. D. C. 337, 265 F. 977, it was held that, if an order or judgment awarding the custody of a minor child could be rescinded or modified by the court of the state in which it was rendered "without regard to the previous judgment upon the subject, it could be done by the courts of any other state, since the full faith and credit article does not require that greater effect shall be given to a foreign judgment than it would have in the state where it was rendered," in support of which cases from the Supreme Court of the United States are cited.

While the full faith and credit clause of the Constitution applies only to judicial proceedings of courts of other states, yet, under the doctrine of comity, we are not required to give greater effect to an order or judgment of a foreign country than we would to that of a sister state; and on principle there is no good reason why we, under such doctrine, should give greater effect to an inter-

locutory order of a foreign country than the court in which it is rendered could itself give it.

We now come to the pleaded California judgment. Here again we can only look to the judgment roll as attested and certified to by the clerk, the custodian of the record of that court. But here again there was in this proceeding offered in evidence by the plaintiff a copy of the transcript of the evidence and of the opinion of the superior court taken and rendered in such cause and certified to only by the official stenographer and not by the clerk of the court, nor attested to by him, nor as certified by the clerk was either the transcript of such evidence or the opinion of the court filed or otherwise made a part of the record of such cause; nor was either in the custody of the clerk, nor is either included in the transcript of the record as certified to and attested by the clerk. All that the clerk attests and certifies to are the pleadings, the petition for the writ, and the return of the defendant and of her mother, and the order that the child "be taken from the custody of the said Hilda Betty Cooke and that the custody of said child be delivered to James Henry Cooke, father of said child, or his nominees forthwith." Of course, the clerk could not certify to or attest the transcript of the evidence or of the oral opinion of the judge, for neither was in the custody of the clerk. Thus all we can notice and consider as to that cause is the judgment roll as attested and certified to by the clerk of that court.

Looking at the petition, we find that the only ground alleged by the plaintiff for the custody of the child was the interlocutory order of the Canadian court of date January 26, 1925, with allegations that the child was kidnapped from Canada and unlawfully brought into the United States and that warrants were issued in Canada for the arrest of the defendant. The whole claim there of the plaintiff to the custody of the child was based on such interlocutory order. The plaintiff tendered no other issue. The defendant filed a return, in detail alleging the facts of her arrest and of the

child on the deportation proceedings instituted by the plaintiff, and that because thereof, and not otherwise, she and the child were brought to San Francisco and, while there in attendance upon the hearing and in the custody of the inspector and the Immigration Bureau, process out of the superior court of California was caused to be served on her by the plaintiff in the habeas corpus proceedings, and later filed an amended return, wherein such matters were alleged in still further detail, and in which, among other things, it was alleged by her that she then was (June, 1925) and for many years prior thereto had been a resident of Canada and at no time a resident of California, and in such amended return denied that the plaintiff, because of the pleaded Canadian judgment, was entitled to the custody of the child, or that the defendant's rights to the custody of the child were therein terminated, and denied that the Canadian court had jurisdiction of the defendant, or of the child, or that her possession of the child was wrongful or unlawful, and specially alleged the proceedings pending before the immigration authorities against the defendant, her mother, and the child, and that, until such hearings were completed and report thereon made to the Secretary of Labor and a decision thereon rendered, the defendant and the child were subject exclusively to the jurisdiction of the United States, and that the custody of the child could not be delivered to any authority other than the authorities of the immigration officers or bureau or to the surety, without violating the statutes of the United States to that end made and provided. The only other matter there shown by the transcript of the judgment roll is the order requiring the defendant "forthwith" to deliver the child to the plaintiff and before the decision in the deportation proceedings was rendered and while the child was in the custody of the Immigration Bureau and of the surety company who had obligated itself to hold and produce the child amenable to the orders of the Secretary of Labor. There were no findings in the cause before the superior court.

We, of course, must assume that the court made its order upon and within the issue presented by the petition and that it did not go beyond it.   It matters not what court acts.   Every court must acquire jurisdiction from   11-15 its record which every court must have and keep and which binds the court; and there is no principle better established than what is not juridically presented cannot be juridically decided.   Just as elemental is it that pleadings are the juridical means of investing a court with jurisdiction of the subject-matter to adjudicate it and that a judgment or decree beyond or not within them is a nullity, for the court is bound by its record.   These are immutable elements.   Thus does it follow that the California order was based on the interlocutory order of the Canadian court, the only ground alleged in the petition by plaintiff for the custody of the child, and that the California court could not breathe greater life into the Canadian order than it possesses, and, interlocutory as it is, any order based alone upon it can have no greater effect.   Further, the plaintiff both by his pleading and evidence pushed before us the Canadian order under which he here claims the right to the custody of the child and invokes our opinion and judgment on it.

Though we were permitted, which we are not, to look at the opinion of the superior court of California certified to only by the official stenographer and not by the clerk nor attested by him, the matter is but thrown into confusion. There at the threshold the judge states that—

"The evidence discloses that the mother (the defendant) sought alimony in the Canadian courts and her application was denied; the court finding she was guilty of adultery."

But no such matter or issue was tendered to the superior court.   Nothing of that kind was alleged in the petition, nor any reference made to it; nor was it therein alleged that the defendant had committed adultery, or because thereof that she was unfit for the custody of the child, or that she was otherwise immoral or unfit or not a proper person to

have the custody of the child.    Then the judge further
stated:

"Thereafter (after the alimony action) habeas corpus proceedings
were instituted in the Canadian courts and while those proceedings
were pending the mother kidnapped the child and brought the child
into the United States."

Such is all the judge declares with respect to such pro-
ceedings.  The plaintiff alleged that thereby he had obtained
a final order or judgment awarding him the custody of the
child.  The California court merely says that such proceed-
ings "were instituted," and pending them the defendant kid-
naped the child, but declared nothing as to whether such
proceedings resulted in a judgment or order of any kind,
*or whether interlocutory or final,* the basic matter alleged
by the plaintiff and upon which his right to the custody was
based.  Then the judge further stated that under the laws
of California different from Canada, the mother presump-
tively was entitled to the custody of a minor child of tender
years, but that "it is for the trial court to say upon all the
evidence adduced at the trial whether she is any more worthy
of such trust than the father" and that "the predominating
factor in such circumstances is the welfare and interest of
the child."  But again no such issue was tendered and no
claim made by the plaintiff that the defendant was unfit
for or unworthy of the custody of the child, or that it was to
the best interest or welfare of the child that it be taken from
the mother and given to the father, and hence it was just as
vain in the judge declaring himself with respect to such a
subject as had been any attempt to prove it.  Then says the
judge that he had read the testimony taken before the Ca-
nadian court in the alimony proceeding and reached the con-
clusion that such evidence fully supported the judgment of
the Canadian judge finding the mother guilty of adultery,
and that the father was a fit and proper person for the cus-
tody of the child, such as the law requires and demands."
But again it manifestly appears that no issue either as to
the plaintiff's fitness or the unfitness of the defendant for

the care and custody of the child was tendered, nor any issue with respect to any question of adultery or any immorality or wrong whatever on the part of the defendant. Thus as to such matters it is clear on the face of the record that the California court spoke without its record and declared a mere vain thing. None of such matters so declared by the judge was found or embodied in the order, or otherwise made to appear of record. Apparently the California court read the testimony in the alimony action to ascertain whether the evidence supported the opinion of the Canadian judge, and, finding that it did, confirmed it or concurred therein. What would the California court have done had it found to the contrary? Would it then have annulled or disregarded the Canadian order or judgment on the ground of insufficiency of the evidence to support it? Manifestly not. And as futile is the one as the other. Though want of jurisdictional matters or a fatal infirmity, whether of subject-matter or of person, appearing on the face of the judgment roll may, of course, be noticed either on direct or on collateral attack, for every court must have its mandatory record and is bound by it, including the statement of the cause of action or ground of defense as laid, and may not disregard it or otherwise make or choose its case, but to look at or consider the evidence (except as a reviewing court and then only when properly settled in a bill and certified to as by statute provided) to ascertain whether an order or judgment was or was not supported by sufficient evidence is not permissible; and we here have referred to such matter in review of the ruling of the referee excluding it and for no other purpose.

Looking further at such mandatory record of the superior court and as certified to and attested by the clerk, it appears that the special plea of privilege or immunity from service of process out of the California court was not considered or determined. The facts and circumstances of such plea, and as therein alleged, were not, as appears on the face of the record, disputed or controverted; nor was such plea in

any particular disposed of. That the facts so averred and not controverted rendered the defendant privileged and immune from service of process out of the California court cannot be doubted. 21 R. C. L. 1305-1308; 32 Cyc. 492, and cases there cited from many different jurisdictions. Such is the rule in California. *Fox* v. *Hale & Norcross S. M. Co.*, 108 Cal. 369, 41 P. 308; *Hammons* v. *Superior Court*, 63 Cal. App. 700, 219 P. 1037. In the latter case it was held that "service of summons made on a party who has come into a state solely to attend and to testify at another trial is invalid; such party being privileged from service of summons while in attendance upon another trial," and by prohibition restrained the rendition and entry of a judgment based on such service. The same rule of privilege or immunity applies to a suitor as to a witness and to an alien as well as a citizen. 21 R. C. L. and 32 Cyc., supra. While the Court of Appeals of California in the case of *Cooke* v. *Superior Court* (Cal. App.) 239 P. 381, held that an assertion of a claim of immunity did not ipso facto divest the court of jurisdiction, that the immunity is a privilege which may or may not be waived, depending on circumstances, yet it did not hold or declare that the privilege there for any reason was waived, and on the face of the record the claim of privilege was made at the threshold of the case and on the defendant's first appearance therein, and was not waived. Nor did the superior court, or any court, find or adjudge or declare any waiver whatever, or any facts or circumstances in the slightest degree showing or tending to show a waiver. Such a fatal infirmity going to the jurisdiction of the person and appearing on the face of the mandatory record may be noticed by any court either on a direct or on a collateral attack. Thus, for all the reasons heretofore stated, we think the judgment rendered by the superior court of California, if not a nullity, at least is not a binding adjudication of the issues here presented, for the issue there presented by the plaintiff was, as is seen, a single issue, the interlocutory order of

Canada, but which he here presents anew, pleads it and puts it in evidence and invokes our ruling with respect to it, and upon it, among other things, here asks that the custody of the child be awarded to him.

This brings us to the Nevada divorce judgment. The plaintiff does not assail it on the ground of fraud. All that he alleges in such respect is that the Nevada court acquired *no jurisdiction of his person;* that his appearance in the case was special and not general; and that the child at no time was a resident of Nevada. But the plaintiff did not allege that the defendant was not an actual and bona fide resident of Nevada for a period of six months or more prior to the commencement of the action in the Nevada court; nor did he deny the allegation made by her that for such period and longer prior to the commencement of such action she was an actual and bona fide resident of Nevada and there actually and physically domiciled for such period. That the child, from the time the defendant left Canada until these proceedings were commenced, was at all times with and in the care and custody of the defendant, and in her care and custody from the time the defendant arrived in Nevada on January 20, 1925, until October 22, 1925, when the divorce proceedings were commenced, is not denied by any one but admitted by all concerned in these proceedings. That the child was thus then within and subject to the jurisdiction of the Nevada court is not denied. In the divorce proceedings, upon a proper and verified complaint being filed, and upon a proper affidavit being made showing that the defendant was a nonresident and not subject to personal service within the jurisdiction of the court, and averring facts justifying publication of summons, and obtaining an order of the court authorizing the publication of summons as by the statute provided, and upon mailing to or personally serving copies of the summons and of the complaint on the defendant, and upon such service being completed, that the Nevada court *acquired jurisdiction to render a default judgment* and grant a decree upon the ground or

grounds stated in the complaint dissolving the marriage relation and awarding the custody of the child or children of the parties and *within and subject to the jurisdiction of the court,* is not disputed or questioned. All that the plaintiff by his pleading here alleged in such respect is that he, in the proceedings in Nevada, entered a mere special and not a general appearance. He does not here allege that the complaint, or the affidavit, or order for publication of summons, or service of it as by the laws of Nevada provided, was insufficient or even irregular, or that the judgment rendered by the Nevada court was void. Not challenging any of such matters, the Nevada court, under its laws, was authorized to render a default judgment against the defendant and a decree of dissolution of the marriage relation and to award the care and custody of the child *within the jurisdiction of the court,* subject of course, to subsequent changed conditions affecting in some substantial degree the welfare of the child, though the plaintiff had made neither a special nor a general appearance in the cause; and such a judgment would be binding upon the parties generally in this country, but perhaps not in Canada where no judgment dissolving the bonds of a marriage contracted in Canada is recognized, unless both parties were domiciled, or where there was a matrimonial domicile, within the jurisdiction of the court. But such is not the rule in Nevada nor in this state, nor in this country generally. And as no subsequent changed conditions are averred it is not of much importance whether the appearance of the plaintiff in the Nevada court was special or general.

The Nevada court, however, found that the plaintiff's appearance was general, not because he there appeared to merely move to quash the issuance or service of summons, *but because he, in such proceeding, challenged and invoked a ruling on a material and necessary averment in the complaint and applied for and was given leave to further plead* pending the hearing and determination of his motion. Of course, an appearance in a case to quash

the issuance or service of summons is a special and not a general appearance, regardless of whether the party so appearing denominates it special or general. So, too, a party appearing in a case and filing a general demurrer to the complaint, or otherwise pleading to the merits, is a general and not a special appearance, regardless of whether it is or is not by the party denominated a special appearance. "So," it is stated in 4 C. J. 1338, "an application for an extension of time to plead is a recognition of the jurisdiction of the court over the person and constitutes a general appearance." Among other cases there cited from many different jurisdictions in the case of *State* v. *McCullough*, 3 Nev. 202. And in 2 R. C. L. 330, it is stated that—

"The request for time in which to answer to the merits constitutes a general appearance, the effect and scope of which may not be limited by any statement on the part of counsel that he desires the record to show that his appearance is special."

In some jurisdictions, as in California, the matter is regulated by statute providing that an application for an extension of time to answer is not a general appearance; and in the absence of such a statute such an appearance in some jurisdictions is held not to be a general appearance. *Lowrie* v. *Castle*, 198 Mass. 82, 83 N. E. 1118; *Fulton* v. *Ramsey*, 67 W. Va. 321, 68 S. E. 381, 140 Am. St. Rep. 969. But we believe the weight of authority is as stated in 4 C. J., and hence, on the face of the judgment roll of the Nevada court, it appears that that court also had jurisdiction of the person of the plaintiff because of the kind of appearance there made by him. But, whether the court had or had not acquired jurisdiction of his person by such appearance, the court, nevertheless, acquired jurisdiction to render judgment dissolving the marriage and awarding the custody of the child within the jurisdiction and before the court, subject to subsequent changed conditions.

The plaintiff here in argument called attention to the amended return filed by the defendant in the deportation

proceedings wherein she, in June, 1925, stated that she was then a resident, not of California, but of Canada, as disputing her averment in her complaint filed in the Nevada court and of the court's finding on the evidence there adduced that she was an actual and bona fide resident and physically domiciled in Nevada continuously for more than six months prior to the commencement of the divorce action. But, inasmuch as the plaintiff did not here assail the Nevada judgment on the ground that the defendant was not an actual or bona fide resident of Nevada covering the period in question, and assailed the judgment only on the ground that the plaintiff himself had not entered a general appearance in such action, and that for such reason the court had not acquired jurisdiction of his person, we think the argument of no pertinency, and, further, though the matter had been properly alleged, the averment in the deportation proceedings is not itself sufficient to overthrow the finding of the Nevada court as to the defendant's residence. Though such averment in the deportation proceedings had been brought to the attention of the Nevada court, still the question of residence of the defendant was one of fact for determination by that court upon all the evidence adduced before that court, and, in the absence of proper allegations and proof of fraud on the part of the defendant in prosecuting such action for divorce, such finding of the court on a collateral attack is conclusive. But the plaintiff here alleged no fraud, and offered no proof of fraud other than calling attention to the averment of the defendant in the deportation proceedings, the circumstances of and under which it was made being explained by the defendant in these proceedings. And, as appears by the judgment roll of the record certified to by the clerk of the Nevada court, the plaintiff on his motion to quash the issuance and service of summons in no particular offered evidence of any kind to support his motion, and declined to argue it, unless the court granted him until January 11, 1926, to do so, which extension of time the court refused.

The Nevada court thus having acquired jurisdiction of the cause, and the plaintiff having there entered a general appearance, or, if not, he, having been personally served with copies of the summons and the complaint, and thereby having actual knowledge of such proceeding, could have entered his appearance in the cause and pleaded to the merits denying the defendant's averments as to her residence in Nevada and that she was a fit and proper person to have the care and custody of the child, and as well there as here could have pleaded his Canadian and California judgment and all that he claimed for them in resisting the defendant's claim of custody of the child. But he failed to do so and now claims the right in this proceeding to litigate what he, if his contentions are tenable, could there have been litigated. We think the Nevada judgment, except as it may be assailed on the ground of fraud or want of jurisdiction, neither of which is here done, is binding upon the plaintiff not only as to the dissolution of the marriage, but also as to the custody of the child, except as to subsequent changed conditions affecting in a substantial degree the interest and welfare of the child, but no such conditions are either alleged or proved.

Thus, epitomizing these various prior orders or judgments, it appears on the face of the several records attested and certified to by the proper custodian that (1) the so-called alimony action in the Canadian court was upon a wholly different claim or demand and upon a wholly different cause of action and did not involve the custody of the child, and no such issue therein was presented or determined, nor is it claimed by the plaintiff that any such issue was involved or determined in such action. (2) That the habeas corpus proceedings instituted by plaintiff in the Canada court was by the petition or complaint of plaintiff based solely on the ground that the defendant, in violation of the agreement of January, 1923, had refused to let him, alternately with her, and as in such agreement provided, have the custody of the child; but the right otherwise of either

party, or the fitness or unfitness of either, to have the custody of the child was not therein presented, determined, or adjudicated, and that *the order therein made was merely interlocutory and not final.* (3) That the habeas corpus proceeding instituted by plaintiff in California was by his petition or complaint based solely on the interlocutory order of the Canada court and wherein he alleged that by reason thereof, and not otherwise, he was entitled to the custody of the child, and that the defendant unlawfully withheld it from him; and, as we look at the record there attested and certified to by the custodian, *no issue was presented, no fact found, and no adjudication made that the defendant was an unfit or immoral or improper person, or that the plaintiff was a fit or proper person to have the custody of the child.* (4) And it is not until we come to the Nevada divorce proceedings, where the issue as to the fitness or unfitness of the parties to have the custody of the child is presented or involved, and where it was expressly alleged, found, and determined that the defendant was, and that the plaintiff was not, a fit and proper person to have the care and custody of the child. There the matter ought to be at rest until upon proper allegations and proof of fraud, or of subsequent changed conditions in a substantial degree affecting the interest and welfare of the child.

Though it be considered that all of the orders and judgments in the proceedings in Canada, California, and Nevada are, so far as concerns the custody of the child, effective only in the state or province where rendered, and as having no extraterritorial effect when the child or children are subsequently brought or found in another state, on the theory that such orders as to the custody of minor children are ever subject to change and modification, and that their welfare at all times and under all circumstances is of such paramount and prime importance that the court in the state where the children may subsequently be, may, notwithstanding prior orders or judgments of foreign or sister states awarding their custody to one parent, take the child or chil-     28

dren from such parent and give them to the other, if
the exigencies of the case require (*Re Alderman,* 157 N. C.
507, 73 S. E. 126, 39 L. R. A. [N. S.] 988, and notes where the
cases for and against the proposition are cited), and the ques-
tion thus as to the custody of the child regarded as at large,
still, considering alone the welfare of the child and the rights
of both parents as subordinate and required to yield thereto,
we, on the record find, as did the referee, that the interests
and welfare of the child will best be subserved and protected
by leaving it in the custody of the defendant. That the child
from its birth has been in her constant care and custody is
admitted by every one; that she is devotedly attached to the
child, and that she has taken good care of it is not denied
by any one, except by the groundless charge—a mere charge
—made against her in the juvenile court, and concerning
which not a syllable of evidence was or is adduced to support
it. The finding of the referee that the defendant's mother,
and the latter's husband, a practicing attorney for many
years in Salt Lake City, are able and willing to provide a
comfortable home for the defendant and the child, and that
the defendant, with their assistance, can well provide for,
maintain, and educate the child, is amply supported by, and
not controverted by any evidence. That the defendant is a
young woman of intelligence and refinement is not disputed
by any one, and that the child, a girl, is of such tender years
as to require the constant attention of a mother, cannot be
gainsaid. In no particular is it alleged or claimed by the
plaintiff that the defendant is an improper, or immoral, or
unsuitable person to have the custody of the child, except
the pleaded alimony judgment of the Canadian court alleged
by him to be an adjudication of adultery committed by the
defendant in Canada, but which, as has been seen, was not
established by any competent evidence. Her relations
or associations with Welch, as heretofore referred to,
though indiscreet, were not of such a character as to
show her immoral. And, in the absence of any charge or
allegation of unfitness or immorality of the defendant, such

matters were irrelevant to the issue. Then, too, the unfitness which deprives a parent of the right to the custody of the child must be positive and not merely comparative, or merely speculative. And, too, as heretofore observed, the referee with respect to this matter had before him the witnesses and heard their testimony and found that there was "no evidence of even a suspicion of improper relations between the defendant and Welch." Thus a finding that the defendant is unfit to have the custody of the child is not, on the record, demanded or justified.

That the child is a comparative stranger to the plaintiff is not denied. He himself testified that the child did not know him. To take the child from the defendant and give it into the custody of the plaintiff would, as found by the referee, "endanger her happiness and welfare" and break up the attachment between the child and the defendant and deprive it of a mother's care. On the record there is not anything to show that the plaintiff ever manifested any affection for, or took any interest in, the child, except to deprive the defendant of it. The finding of the referee that the plaintiff, from the start of his married life, was "uncongenial and erratic," and without cause "evinced an implacable dislike for the defendant's mother," and during the first years of the marriage "seemed to have a mania for separation agreements not at all attributable to his wife's indiscretions," is amply supported by the evidence. The plaintiff's preparing separation agreements during the defendant's pregnancy and demanding and procuring her to sign them, when he did not then, nor does he now, claim that his wife up to that time, or for a long time after the birth of the child, had in any particular violated any of her marital obligations or had not been to him a dutiful and faithful wife, shows extreme disrespect for and cruelty to her, and because of the mental distress necessarily occasioned thereby in a woman in such a condition, an utter disregard for the effect of such conduct on the child. After he had through deceit taken the child from her and he was willing to and did return it to her upon

her signing documents turning over to him the exclusive occupancy of the home, induced her to go to Buffalo where he, clandestinely, at week ends for three months, lived and cohabited with her, and during such period sold the home and some of the furniture and took the rest to furnish apartments for himself.   He filed complaints in and had warrants issued out of the criminal courts in Canada, in one of which he alleged that the defendant had "unlawfully received" the child, and in the other had "unlawfully enticed" the child from "its parent."   At about the same time he filed a complaint with the Immigration Bureau at San Francisco, ostensibly to deport the defendant and the child, but with the real purpose by such means to enable him to get custody of the child, and thereby resorted to such public measure for mere private gain, to accomplish which he caused, and stood by and saw, his wife and child for several days languish in jail at Reno and several days at San Francisco.   Admitting that no extraditable offense was committed by the defendant in Canada, yet he issued and sent abroad and in some instances published circulars for the arrest of the defendant wherever she may be found, and 2 or 3 days before her arrest at Salt Lake City, he, in Toronto, was in communication with the sheriff of Salt Lake county, and, upon her arrest and the officers here wiring the officers at Toronto "for particulars," he directed them at his expense to wire the sheriff "the information."

We need not pursue the matter further, for it is apparent, and as was said in the case of *People* v. *Multer*, supra, that the "father in this case is not actuated by a desire for the welfare of the child as much as by the desire to annoy the mother," against and toward whom and her mother he has manifested a deep feeling of hatred and resentment, and a willingness to publicly brand the mother of his child with infamy and to resort to most any measure to take the child from her.   Thus, on the merits, as well as on the grounds presented by plaintiff's petition and as heretofore considered, we are of the opinion that the writ must be denied

and discharged. And as I think such should be the order and the child left with the defendant unrestricted where we found it. But this further matter is suggested. The defendant has no present income of her own. In case of separation of husband and wife the wife usually has no separate income apart from that of the husband. Such, however, is no legal reason to deny her the custody of a minor child. *Rietmann* v. *Rietmann*, 168 Ky. 830, 183 S. W. 215. In most divorce or separate maintenance actions the husband has better ability and means to support minor children than has the wife. The plaintiff here has shown better financial ability than the defendant. Notwithstanding that, our statute gives to her the paramount right to the custody of a minor child, and where the custody is awarded to her there generally is also a binding order or decree requiring the husband within his ability to support and maintain the child. Though the plaintiff be denied and the defendant awarded the custody of the child, he still owes a clear, legal duty within his means to support and maintain the child, or at least to contribute towards its support. Had issues in such respect been here tendered, which were not done, the plaintiff, within the jurisdiction of the court, could be compelled to support and maintain the child, though its custody be left with or awarded to the defendant.

As found by the referee the defendant, with the aid of her mother and of the latter's husband, is able to maintain the child and give it a good home. Of course, if the plaintiff refuses to contribute anything towards the support of the child in case the custody be not awarded to him, and if the defendant should not get the promised support from her mother, nor from her aunt, who has ample fortune in her own right, the defendant's immediate ability to support the child would rest on her own earning ability, except as the Nevada decree could be enforced against the plaintiff in Canada, which, as has been seen, is doubtful under the Canadian laws because of the marriage having been con-

tracted in Canada and there having been no matrimonial domicile in Nevada.

The defendant with the child is now abiding and living with her mother, at Salt Lake City, who is willing to give them a permanent home. Thus let this be the judgment: (1) The writ prayed for by plaintiff is denied and discharged. (2) The custody of the child, until the further order of this court, is awarded to and left with the defendant, providing that she maintains and keeps the child at her mother's residence and under her care, or in some other suitable and proper home, in Salt Lake City, and keeps the child within the jurisdiction of this court and holds it amenable to the further orders and process of this court. (3) That the plaintiff, providing that he within his means makes reasonable contributions for the support and maintenance of the child, shall at all reasonable times be permitted to visit with the child, and in case he makes such contributions the defendant shall render to him an itemized account showing the expenditures thereof for the use and benefit of the child. (4) That, in case of subsequent changed conditions in a material degree affecting the welfare and interest of the child, either party hereto, on 10 days' written notice personally served on the other, may by verified petition with respect to such changed conditions apply to this court for a modification of this order or judgment as to the future custody of the child. (5) That the defendant is hereby given her taxable costs for and on her behalf incurred and that she be given execution therefor. (6) That within 10 days after the filing of this opinion the defendant's mother and her husband, Mr. and Mrs. Frank B. Scott, shall file with the clerk of this court their written acceptance of all the duties and obligations to be observed and performed by them or either of them mentioned in this order.

FRICK, J., concurs.

THURMAN, J., concurs in the order of the court.

GIDEON, C. J. (dissenting). In this jurisdiction, in actions involving the right to the custody of minors—especially children of tender years—it has become elementary that the best interests of the child, present and future, shall be the guiding star in controlling the court's conclusions. *Stanford* v. *Gray*, 42 Utah, 228, 129 P. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Parrish*, 43 Utah, 373, 134 P. 898; *Dorsey* v. *Dorsey*, 52 Utah, 73, 172 P. 722; *Farmer* v. *Christensen*, 55 Utah, 1, 183 P. 328; *Kurtz* v. *Christensen*, 61 Utah, 1, 209 P. 340; *Alley* v. *Alley*, — Utah, —, 247 P. 301 (not yet officially reported). It has not heretofore been considered necessary or important in cases of this nature to indulge in any technical reasons to exclude testimony found in the record in arriving at the court's conclusions.

In this case a referee was appointed by this court to take the testimony and make findings upon the controverted issues of fact involved. Among others of the referee's findings is the following:

"I find that James Henry Cooke, the plaintiff, is a man of good moral character and social and financial standing, and that he is a fit and proper person to have the custody of the child in question. On the witness stand he impressed me as being absolutely truthful. I find untrue the allegations that he is addicted to the use of narcotics or the excessive use of intoxicating liquors; that he attacked some of the defendant's female relatives or was familiar with a servant; and that he burned an automobile for the purpose of defrauding an insurance company; and I find untrue the allegations of misconduct contained in the following parts of Mrs. Cooke's answer: The third paragraph on page 3, and all of page 4; the paragraph beginning on page 6 and down to the first paragraph beginning on page 8.

"The plaintiff is willing and able to give the child a good home, under the charge of his sister, and he is well able financially to maintain and educate her."

That finding is abundantly supported by the testimony. Indeed, there is little, if any, reliable evidence in the record to support a contrary finding. The only evidence that casts any reflection upon the character of Mr. Cooke is that of

the defendant Mrs. Cooke, her mother, Mrs. Bowman, now Mrs. Scott, and possibly a sister of Mrs. Cooke. Sixteen or more disinterested professional and business men gave their unqualified statements under oath as to the high character of plaintiff. These witnesses had known plaintiff personally and professionally and in business for many years. Some of them knew his father in his lifetime. Many of them knew his mother and sister, at whose home the child would be cared for if given into the custody of its father. Without a dissent they stated that, if the child were placed in the custody of its father and in the home in charge of the father's sister, it would have a home of culture and be surrounded with refinement and comfort. Two or more women who had known the family of Mr. Cooke for many years testified to the high character of his mother and sister and stated that in their judgment their home would be an ideal home for the little girl and that the surroundings there would be ideal for any little girl such as the one whose custody is in controversy here. The testimony of those witnesses furnished all the support necessary for the referee's finding that—

"The plaintiff is willing and able to give the child a good home under the charge of his sister, and is well able financially to maintain and educate her."

These witnesses are residents of the city of Toronto, province of Ontario, Dominion of Canada. That city was the marital home of plaintiff and defendant and both are natives and citizens of the province of Ontario. The witnesses knew the character of plaintiff and know his home surroundings by many years of everyday contact. Their testimony was not simply statements of members of plaintiff's family. On the contrary, the only relative who testified on behalf of plaintiff was a brother-in-law of the defendant, a Mr. Watts, who had married Mrs. Cooke's sister.

Six witnesses from the province of Ontario, most of them from the city of Toronto, testified to the good character of

the defendant. Four of those witnesses were relatives of defendant. Two of them were her sisters. One was a brother. Another was an aunt. The other witness, a Mrs. Gertrude Langley and her son, were not relatives. The defendant resided in Toronto most if not all of her life. It is significant that out of all her acquaintances she was able to have but two witnesses not relatives testify concerning her character. It is true that witnesses from Nevada testified in her behalf and as to her character. It should be remembered, however, that Mrs. Cooke became a so-called resident of the state of Nevada only in January, 1925, and that she resided there but nine months and much of that time under an assumed name. It is merely a truism to say that these witnesses could not and did not know either her character or her fitness to have the custody of the child as witnesses would who had seen her grow up and who had known her from choldhood. True, the referee found that she is a fit and proper person to have the care and custody of the child; that she is a woman of intelligence and refinement; and that she and the child are devotedly attached. The testimony undoubtedly supports the statement that the mother is devotedly attached to the child and that the child is fond of its mother. We are not, however, required, neither ought we, to determine the future custody of this little girl on the mother's affections nor on the child's affections. That may be a proper and even an important element, but it is not the only nor the controlling one. The present and future interests of the child should be the deciding factor.

The order that the referee recommended would seem to indicate that he entertained some doubt as to the wisdom of giving the custody of this child to defendant. The judgment of this court indicates rather conclusively that the majority of the court entertain the same doubt. The recommendation of the referee is that the child be awarded to the defendant for a probationary period and that she be required to give security that she will not remove the child

from the jurisdiction of this court. Apparently the order of this court not only follows the recommendation of the referee, but goes further in that it provides:

That "within 10 days after the filing of this opinion the defendant's mother and her husband, Mr. and Mrs. Frank B. Scott, shall file with the clerk of this court their written acceptance of all the duties and obligations to be observed and performed by them or either of them mentioned in this order."

If Mrs. Cooke, in the light of the testimony, is entitled by reason of her own fitness to have the custody of the child and to give the child a home, then she should be awarded the custody of the child. If she is not entitled by reason of her own fitness, then the custody should be awarded to its father, who is admittedly a fit and proper person to have the custody of the child. Defendant does not claim to be a permanent resident of Utah, nor is she at all a citizen or resident of Utah. Her residence in Utah in the record is referred to as being "temporary residence" only. What legal right has the mother of the defendant or her recently acquired husband to the custody of this child, or what legal duty to feed, clothe, and educate it is either of them under? In effect the order of this court charges the mother of the defendant and her husband with the duty not only of supporting the child, but of keeping it within the jurisdiction of this court. Their rights to or qualifications for the custody of the child are not in issue in this proceeding. No testimony was taken as to Mr. Scott's financial ability or other qualifications which would entitle him to be given the custody of the child. In fact, Mr. Scott is a stranger to this proceeding. It does appear that he made a statement that he would give the defendant and her child a home, but other than that he is in no way connected with this action. Mr. Scott's fitness for the custody of this child is not an issue in this case. No such issue was presented by the pleadings. No testimony was taken respecting his qualifications. Therefore the court is not advised as to his ability or his qualifi-

cations. The court, therefore, has not sufficient information upon which to found an order intrusting the custody of this child to him. The plaintiff, Mr. Cooke, had no opportunity to question or investigate Mr. Scott's fitness or his ability to give the child such a home as under the facts made to appear in this case is the child's right. It is wholly indefensible to contend that Mr. Cooke is lacking in any qualification necessary to entitle him to have the child. Why, then, give it to strangers? Is it the purpose of this court to again review this question in the event that Mrs. Cooke is derelict in her duty or unable to care for the child and then to modify or change its order and award the care and custody of the child to its father? Or does the court contemplate at all hazards keeping this child within the jurisdiction of this court even to the extent if need be of awarding its custody to some absolute stranger not only to the proceedings, but to the child itself? The order of the court is:

"The custody of the child until further order of this court is awarded to and left with the defendant, provided that she maintains and keeps the child at her mother's residence and under her care, or in some other suitable and proper home, in Salt Lake City, and keeps the child within the jurisdiction of this court and holds herself and the child amenable to the further orders and processes of this court."

Apparently the order of the court not only is that the child must be kept within the jurisdiction of the court, but must be kept within the boundaries of a particular municipality within the jurisdiction of the court, namely, Salt Lake City. Just what virtue attaches to Salt Lake City not equally existent in other parts of the court's jurisdiction is left somewhat in doubt.

There is, however, in my judgment other and very conclusive reasons why this court should award the custody of this child to the plaintiff. Both plaintiff and defendant are citizens of the province of Ontario, city of Toronto, Dominion of Canada. Their rights growing out of their marital relationship and their rights to the custody of this child

were in litigation in the courts of that province at the date the child was brought into the United States. An action for alimony was pending in the superior court of the province of Ontario instituted by the defendant here, plaintiff there, against the plaintiff here, defendant there. The testimony taken on the hearing in that action is part of the record of this proceeding. That testimony by the referee was held not to be admissible to establish any controverted fact in issue here, and this court rules to the same effect. Looking at the judgment roll of that case alone, which was properly certified, there is no other conclusion permissible or reasonable than that the Canadian court in that action had jurisdiction of the parties and of the subject-matter and that the said court found the defendant guilty of such conduct as ought to deprive her of any right to claim the custody of this child. In the statement of claim filed with the clerk of the Canadian court in that action, which is analogous to a complaint under our practice, Mrs. Cooke, who was plaintiff therein, charged her husband, the plaintitff here, with certain acts of neglect and cruelty and with refusing to live with her, and sought the judgment of that court compelling her husband to pay alimony. Mr. Cooke, defendant there, plaintiff here, in his statement of defense, in the fifth paragraph thereof, said:

"After this action [in a previous divorce proceeding] on the part of the private bills committee, the plaintiff [Mrs. Cooke] offered to return to the defendant [Mr. Cooke] and live with him as his wife, which offer the defendant rejected, and the defendant admits his liability to pay alimony to the plaintiff in accordance with his means (which are not as stated by the plaintiff) if the defendant does not at the trial of this action establish to the satisfaction of this honorable court that the plaintiff has been guilty of adultery in some at least of the following instances.   *    *    *"

At the conclusion of an 8-day hearing Judge Orde, who had presided and heard the testimony, entered an order dismissing the action. The fifth paragraph of the statement of defense above quoted tendered the real issue in that case.

No other deduction is permissible from the issues presented by the pleadings than that the defendant in that action, Mr. Cooke, supported that allegation in the fifth paragraph of his statement of defense by evidence convincing to the court of its truthfulness.

While it is true that the majority opinion excludes the the testimony taken at the hearing and refuses to consider it as having any weight in determining the issues here, it is nevertheless stated in that opinion that there was some indirect testimony given in that action tending to show indiscretion on the part of Mrs. Cooke. If we are permitted to refer to that testimony at all and consider it, as the court evidently did when it stated that there was some testimony showing that the defendant had been indiscreet, then I fully agree with the statement contained in a decision rendered by Hon. J. J. Trabucco, of the superior court of the state of California in and for the city and county of San Francisco, rendered on Tuesday, September 29, 1925, disposing of a habeas corpus proceeding involving the right to the custody of this same child which he had heard or tried. In that statement Judge Trabucco said that he had examined the evidence and testimony taken and considered by the Canadian court and that after so doing he had reached the conclusion that the evidence taken in that case supported the judgment of Judge Orde that the defendant had been guilty of the acts charged in the fifth paragraph of the statement of defense by her husband, not only by a preponderance of the evidence, but to a moral certainty and beyond a reasonable doubt. The California court in that action, gave the custody of the child to its father. That judgment of a sister state is still in force and effect.

At the date the little girl, whose custody is in controversy here, was removed to the United States from Canada, to wit, January 14, 1925, there was pending in the Canadian court a habeas corpus proceeding to determine the right of the plaintiff therein, Mr. Cooke, to have the custody of this child. That matter had been in the court for some months.

Both the plaintiff and the defendant here had appeared in that action. After the departure of the defendant Mrs. Cooke from Canada, and after her entrance into the United States with her mother and the little girl, a decree was obtained in the action awarding the custody of the child to the father. It is true that the hearing of the action, shortly after its institution, had been postponed indefinitely, but Mrs. Cooke had given her personal undertaking to the court there to keep the child within the jurisdiction of that court until the controverted question as to which of them was entitled to the custody of the child had been determined. Mrs. Cooke's counsel had likewise given his undertaking to the court that the child would be so kept within the jurisdiction. The attorney representing Mrs. Cooke in that action died before the action was called for hearing. Whatever irregularity there may have been in obtaining the decree awarding the custody of the child to the father it is without question that the court had jurisdiction of the parties. They had both appeared in court and been represented by counsel. It is undisputed that the mother of defendant, now Mrs. Scott, on the evening of January 14, 1925, the very day that the testimony was closed, the arguments made, and the judgment entered in the alimony action, took the child across the border and came into the United States. The defendant followed a day or two afterwards. Immediately thereafter they migrated to Reno, Nevada, and took up their residence there under an assumed name. In December, 1925, the defendant, with her mother and the child, came to Salt Lake City.

The principle or rule of law enunciated by the Court of Appeals, First District, Cal., in *Ex parte Wenman*, 33 Cal. App. 592, 165 P., at page 1025, expresses what, in my judgment, should be controlling in the present action. In the Wenman Case the court said:

"It is shown by the record before us that the minor was brought to this state by the respondent in direct violation of a decree of a

court of competent jurisdiction of a sister state awarding its custody to the petitioner. The child's presence here is founded on a tort or offense against the law, and it is not made to appear that since the entry of the decree under which the petitioner is now claiming he has become an unfit or unsafe person to have the care and control of his minor child, and it is admitted, at least tacitly, by the respondent in her return that she could not establish her right in the courts of Connecticut or New York, to the relief which, 3,000 miles away from the place where the difficulties between the parties arose, she hopes to get in the courts of this state. Under these circumstances we think there is no question but that a due respect for the orderly administration of the law and according to the doctrine of comity among sister states requires this court to recognize the right of the petitioner under the decree of the court of the state of Connecticut hereinbefore referred to, to the custody of Byrd Wilson Wenman, Jr., the said minor."

The judgment of the Canadian court may not be protected by the full faith and credit clause of the Constitution, but it is a judgment of a court of competent jurisdiction in a country where the parties hereto are citizens and where they had their residence. The procedure in the courts of the province of Ontario, Canada, is not materially different from our own procedure. The child, whose custody is in controversy here, was removed from the province of Ontario into the United States in disregard of an undertaking entered into by the mother of the child with the court and was so removed at a time when the right to the custody of the child was in litigation. It was likewise removed on the very day that judgment was entered in the alimony action supporting the contention made by Mr. Cooke, the father of the child. The credit due from the courts of our country to the judgments of the courts of a friendly power in determining the rights of citizens of that power ought to be, if not conclusive, very persuasive upon the courts of this country.

Much importance is given by the majority opinion to the judgment of the Nevada court in the divorce proceeding instituted in that state by Mrs. Cooke against her husband and to the Nevada court's findings on the rights of the

plaintiff and defendant to the custody of the child, and with reference to their qualifications and fitness for such custody. The service of summons in that divorce action was had by publication and not by personal service upon Mr. Cooke within the state. True, Mr. Cooke appeared specially and objected to the jurisdiction. He did not appear generally. The record of the proceedings had in the Nevada court is part of the record in this action and the record speaks for itself. This court is entitled to determine whether from that record it appears that Mr. Cooke appeared generally or specially. 34 C. J. 1140. As I have pointed out, Mrs. Cooke was a resident of the state of Nevada for the extensive period of nine months and a part of that time under an assumed name. Furthermore, during that period of nine months, to wit, on July 7, 1925, in a verified answer to the petition in habeas corpus proceedings at San Francisco, in the state of California, she said:

"Your petitioner herein [Mr. Cooke], your respondents [Mrs. Cooke and her mother], and the said minor child, Shirley Cooke, are and each of them has been for many years last past citizens and residents of the city of Toronto, province of Ontario, Dominion of Canada," etc.

I submit that the Canadian court, a court of jurisdiction where both plaintiff and defendant are citizens, and after hearing testimony offered by both parties, was better able to determine which of the parties was best qualified and fitted as well as best entitled to have the custody of the child, and that the judgment of such court ought to have more weight than the judgment of the Nevada court, where admittedly it was a default judgment, and that Mr. Cooke was not present and did not offer any evidence. Greater weight should be given to the judgment in the habeas corpus proceedings in the Canadian court than should be given to the Nevada divorce decree or findings respecting the custody of this child. The Nevada court did not, as I understand the authorities, have jurisdiction to enter judgment upon the qualifications or fitness of Mr. Cooke to have the custody

of his child. Any judgment respecting his qualifications or fitness would be a judgment in personam and would affect him personally, if valid. The court had constructive service and did not have personal service. Any judgment attempted to be entered respecting his qualifications or fitness was a nullity, outside of the jurisdiction of the court entering such judgment. *De Meli* v. *De Meli,* 120 N. Y. 185, 485, 24 N. E. 996, 17 Am. St. Rep. 652; note to *Averbuch* v. *Averbuch,* Ann. Cas. 1916B, 875.

If, however, there were nothing else in this record save the conduct of the defendant since she came to Salt Lake City, it would be a serious question. In my judgment, whether the court ought not to award the custody of this child to the father in view of his admitted ability to give it a desirable home. It seems that defendant, after arriving in Salt Lake City, was receiving somewhat ardent attentions from a married man, Mr. Earl Welsh. It is also quite evident from the testimony that Mrs. Welsh, the wife of Mr. Earl Welsh, was not particularly pleased with these attentions to the defendant by her husband. She therefore requested and received the aid of a deputy sheriff of Salt Lake county to spy out and ascertain the movements of Mr. Welsh and the defendant. What the deputy ascertained by reason of his efforts to observe the movements of Mr. Welsh and the defendant is stated in detail in the majority opinion. They were alone, in an unfrequented part of the city, between the hours of 2 and 3 o'clock a. m. Their excuse for being there was that they were desirous of viewing the lights of the city and went to this advantageous point to so view the lights of the city. Mr. Welsh at that time was a married man and this fact was known to the defendant. Mrs. Cooke was a married woman. She voluntarily accompanied Welsh on that evening and voluntarily remained with him alone on that ride in a lonely place during those early hours in the morning. The defendant and Mr. Welsh had known each other for only a few months at that time. I have read the testimony taken before the referee with more than

usual care and I confidently assert that there is not a scintilla of evidence in the record to support the referee's finding that Mrs. Cooke "has been harassed for many months by" Mr. Welsh, nor that Mr. Welsh "has taken advantage of her condition and forced his attentions upon her." Nor is there any evidence that the attentions given her by Welsh were not welcomed by her. It should be remembered here that the defendant, as is set out in much detail in the majority opinion, had been charged in the Canadian court with adulterous acts and by reason thereof it was sought to take from her the custody of the child. In the light of those facts her conduct immediately after arriving in Salt Lake City is indeed most inexplicable if, as is claimed, this early morning ride at 2 a. m. was for pleasure only.

There is no testimony that the defendant is able to furnish this little girl with a home or the comforts of a home. Admittedly she is without funds and has no property of her own. Her mother, with whom she is now residing, has recently married a practicing attorney at law of this city. The mother was a widow at the time of her departure from the Dominion of Canada. The testimony is undisputed that the mother is without property and has no means of her own with which to support either herself or her daughter, or her granddaughter. There is no evidence of the financial ability of Mr. F. B. Scott, the husband of defendant's mother, to furnish this defendant and her child a home or surround them with any of the comforts of life or to educate the little girl as she should be educated. The defendant is admittedly without education. She does not even have a high school education. She has no occupation or business of any kind. There is no showing that she can support herself and the child by any form of labor or kind of work for which she is adapted. There is some testimony that she has a rich aunt and that that aunt has contributed some to their support since they hastily, surreptitiously, and clandestinely left their native land. The little girl in this case is entitled to be supported by her father or mother and not by charity.

Her father is able and willing to give her that support. This little girl, as every little girl, is entitled to a home and a home where she can have such training as her parents are able to provide. That is her right. As I look upon this record, by the judgment of this court she is being deprived of that right. The father testified that it is his wish and desire to educate this child and give her every opportunity to become a cultured and useful woman.

Some statement is made in the majority opinion to the effect that the child is a comparative stranger to her father and that the plaintiff testified that the child does not know him. I have found nothing in the record justifying that statement. I do not, however, say that the record does not support the statement, but I do say that, after a most careful reading of the record, I am convinced that, if it be a fact that the child does not know its father or is a stranger to him, it is because the defenant, wrongfully and contrary to her agreement and undertaking with a court of her native land, clandestinely removed the child from its home land and has ever since kept it separate and apart from its father.

I appreciate the fact that the wealth of a parent ought not be the controlling factor in the determination of the right of that parent to the care, custody, and control of an infant child. Nevertheless, it is an element to be taken into consideration by the court when all of the facts are presented to it and it is called upon to determine where the custody of a child should be. The conduct and acts of the defendant, considered in the most charitable view that ought to be taken of such conduct and acts, considered in connection with the ability and fitness of the father to care for the infant, and especially considering the judgments of courts of other jurisdictions which have had occasion to consider this matter, should induce this court to grant the petition of and award the custody of the child to its father. I cannot at all understand just why the court in practical effect is awarding the custody of this child to its grandmother and stepgrandfather in face of the admitted fact that

the father is in every way qualified morally and financially to have its custody.

What of the little girl ten years hence? Does anyone believe, or can anyone believe that her chances for an education, for a comfortable home at that stage in her life when she will need guidance, will or can be furnished her by her mother as it would be by the father? If the mother of this child, knowing all the facts as she does, were unselfishly considering the best interests of this child, present and future, in my judgment she would not refuse to let the father have the child. I doubt if she would refuse if she were removed from the influence of her mother.

If I did not feel so strongly that the judgment of this court is contrary to the great weight of the evidence and all the facts and circumstances in the case and that a grave injustice is being done the little girl thereby, I should not have written this dissent.

CHERRY, J. I concur in the views expressed by the Chief Justice and also dissent from the judgment in this case.